**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

<table>
<tr>
<td>

ADRIAN REYES,
      *Petitioner-Appellant*,

v.

GREG LEWIS, Warden,
      *Respondent-Appellee*.

</td>
<td>

No. 12-56650

D.C. No.
5:12-cv-00691-GAF-E

ORDER AND
AMENDED OPINION

</td>
</tr>
</table>

Appeal from the United States District Court
for the Central District of California
Gary A. Feess, District Judge, Presiding

Argued and Submitted November 19, 2014
Pasadena, California

Filed August 14, 2015
Amended August 17, 2016

Before: William A. Fletcher and Jay S. Bybee, Circuit
Judges, and James K. Singleton, Senior District Judge.[*]

---

[*] The Honorable James K. Singleton, Senior District Judge for the U.S. District Court for the District of Alaska, sitting by designation.

Order;
Concurrence in Order by Judge W. Fletcher;
Dissent to Order by Judge Callahan;
Dissent to Order by Judge Bea;
Opinion by Judge W. Fletcher;
Concurrence by Judge Singleton

## SUMMARY[**]

### Habeas Corpus

The panel issued an order replacing the opinion filed August 14, 2015, with an amended opinion, and rejecting an en banc call, in a case in which the panel reversed the district court's denial of a habeas corpus petition alleging that petitioner's state-court conviction rested on a confession obtained in violation of *Missouri v. Seibert*, 542 U.S. 600 (2004).

The panel held that Justice Kennedy's *Seibert* concurrence, based on a rationale narrowing the result reached by the *Seibert* plurality, constitutes "clearly established" Supreme Court law for the purpose of AEDPA review. Under this concurrence, a post-*Miranda*-warning statement must be suppressed if interrogating officers deliberately use the two-step interrogation technique that was used in *Seibert*, and if effective curative measures are not taken to ensure that the suspect genuinely understood the *Miranda* warnings. The two-step technique involves interrogating in successive, unwarned and warned phases.

The panel held that under the circumstances of this case—where police interrogated the fifteen-year-old petitioner over the course of two days; where on the first day at a police station they conducted a two-hour unwarned interrogation; where on the second day at a sheriff's station they obtained a confession during an unwarned interrogation

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

following an unwarned polygraph test; and where they transported the petitioner back to the police station and obtained a postwarning confession "clarifying" what he had stated at the sheriff's station—a *Seibert* analysis was clearly required.

The panel held that the California Court of Appeal applied a rule that was contrary to federal law as clearly established by the Supreme Court in *Seibert*, and thus was owed no deference, when it concluded that the petitioner's postwarning confession was admissible solely on the ground that his unwarned custodial statement was voluntary, and that his subsequent warned statement therefore was also necessarily voluntary.

The panel held that police officers deliberately employed a two-step interrogation technique, and that they did not take appropriate "curative measures," in violation of *Seibert*. The panel therefore held that the petitioner's postwarning confession should have been suppressed.

The panel remanded with instructions to grant the writ unless the petitioner is tried within a reasonable time, not to exceed 180 days.

Concurring, District Judge Singleton wrote that the California Court of Appeal's conclusions of law are in conformity with *Seibert* and Justice Kennedy's concurrence, but its findings of fact are unreasonable in context.

Concurring in the denial of rehearing en banc, Judge W. Fletcher, joined by Judge Bybee, made four points in response to Judge Callahan's dissent from the denial of the petition for rehearing en banc.

Dissenting from the denial of rehearing en banc, Judge Callahan, joined by Judges O'Scannlain, Tallman, Bea, and Ikuta, wrote that the panel wrongly concludes that Judge Kennedy's subjective-intent requirement in *Seibert* is clearly established Supreme Court law, wrongly permits federal courts to read the worst into state court decisions on habeas review, and wrongly requires all courts to presume the worst of police officers in applying *Seibert*.

Dissenting from the denial of rehearing en banc, Judge Bea joins Judge Callahan's dissent, but wrote separately to reiterate his view that *United States v. Davis*, 2016 WL 3245043 (9th Cir. June 13, 2016) (en banc), which adopted a reasoning-based approach when interpreting splintered Supreme Court decisions rather than a results-based approach, was wrongly decided.

---

## COUNSEL

Elizabeth Armena Missakian (argued), San Diego, California, for Petitioner-Appellant.

Kevin Vienna (argued), Supervising Deputy Attorney Genera; David Delgado-Rucci, and Daniel Rodgers, Deputy Attorneys General; Julie L. Garland, Senior Assistant Attorney General; Kamala D. Harris, Attorney General; Office of the Attorney General San Diego, California, for Respondent-Appellee

---

**ORDER**

The opinion filed August 14, 2015, and reported at 798 F.3d 815, is hereby amended, and is replaced by the Amended Opinion attached hereto.

A judge requested a vote on whether to rehear the case en banc. The case failed to receive a majority of the votes of the non-recused active judges in favor of en banc consideration. *See* Fed. R. App. P. 35.

Future petitions for panel rehearing or rehearing en banc will not be entertained.

---

W. FLETCHER, concurring in the denial of rehearing en banc, joined by Judge BYBEE. Judge Singleton may not vote on petitions for rehearing en banc, but he agrees with what is written here.

We make four points in response to Judge Callahan's dissent from the denial of the petition for rehearing en banc.

First, the dissent begins:

> Fifteen-year-old Adrian Reyes confessed to killing sixteen-year-old Derek Ochoa in a drive-by shooting. He first confessed after acknowledging many times that he was not under arrest and was not required to talk, freely leaving two previous police interviews, taking a polygraph that he and his parents not only consented to but that Reyes initially

suggested, and then asking to speak with detectives. After Reyes confessed, those detectives drove him to another location where they told him that he was no longer free to leave and read him his *Miranda* rights. He again confessed.

Dissent at 10.

An unsuspecting reader might conclude that Reyes was not in custody when he "first confessed," and that his first confession was therefore not taken in violation of *Miranda*. The reader would be mistaken. The California Court of Appeal explicitly held to the contrary. It wrote:

> It is not disputed that defendant was in custody after completion of the polygraph exam, when [polygraph examiner] Heard told defendant he had failed the polygraph test and had lied about his nonparticipation in the murder. Because defendant was not advised of his *Miranda* rights at this point, his statements made thereafter, while at the sheriff's station, were inadmissible under *Miranda v. Arizona*[.]

*People v. Reyes*, No. D047521, 2010 WL 3026227, at *7 (Cal. Ct. App. Aug. 4, 2010).

Second, the dissent contends that Justice Kennedy's concurrence in *Missouri v. Seibert*, 542 U.S. 600 (2004), does not provide the controlling test in two-step interrogation cases. We first concluded in 2006 that Justice Kennedy's concurrence provides the controlling test. *See United States*

*v. Williams*, 435 F.3d 1148 (9th Cir. 2006). Of the seven circuits that have addressed the issue, six agree with us. *See United States v. Capers*, 627 F.3d 470, 476 (2d Cir. 2010); *United States v. Torres-Lona*, 491 F.3d 750, 758 (8th Cir. 2007); *United States v. Street*, 472 F.3d 1298, 1313 (11th Cir. 2006); *United States v. Courtney*, 463 F.3d 333, 338 (5th Cir. 2006); *United States v. Kiam*, 432 F.3d 524, 532 (3d Cir. 2006); *United States v. Mashburn*, 406 F.3d 303, 309 (4th Cir. 2005). The seventh concludes that Justice Souter's plurality controls. *See United States v. Ray*, 803 F.3d 244, 272 (6th Cir. 2015). That conclusion cannot help the dissent because Justice Souter's test is *less* favorable to police interrogators; an interrogation that fails Justice Kennedy's test will necessarily fail Justice Souter's test. Three other circuits have applied both Justice Kennedy and Justice Souter's tests without choosing between the two. *See United States v. Widi*, 684 F.3d 216, 221 (1st Cir. 2012); *United States v. Lee*, 618 F.3d 667, 678 (7th Cir. 2010); *United States v. Carrizales-Toledo*, 454 F.3d 1142, 1151 (10th Cir. 2006).

Third, the dissent contends that our opinion "permits federal courts to read the worst into state court decisions on habeas review," and that it "requires all courts to presume the worst of police officers in applying *Seibert*." Dissent at 11. We strongly disagree. We carefully provide AEDPA deference to the decision of the California Court of Appeal, and our opinion presumes the contrary.

Two of us, Judges Fletcher and Bybee, conclude that the Court of Appeal misunderstood both *Miranda* and *Seibert*, and that its decision was "contrary to" those cases, when it tested the validity of Reyes's confession based on whether it had been voluntary. It has been clearly established Supreme

Court law, ever since *Miranda*, that the test for admissibility of a confession is not whether it was voluntary. Rather, the test is whether it was taken in violation of *Miranda*.

All three of us conclude that the Court of Appeal made an "unreasonable determination of the facts" in concluding that, in employing their two-step interrogation, the officers did not deliberately undermine the effectiveness of the *Miranda* warning that was eventually provided. We describe in painstaking detail every interaction between the officers and Reyes. We unanimously conclude that a court cannot reasonably determine, based on the factual record, that the officers did not deliberately undermine the effectiveness of the *Miranda* warning.

Fourth, the dissent says that our decision "let[s] a confessed murderer walk." Dissent at 11. We are not as confident as the dissent that Reyes is, in fact, a murderer. There is reason to believe that fifteen-year-old Reyes confessed to a crime he did not commit.

Except for Reyes's confession, the evidence at trial pointed to Reyes's cousin, Munoz, as the shooter. It is undisputed that Reyes was a passenger in the back seat, and that Munoz was the driver. Two witnesses testified that the driver of the car shot the victim. One of those witnesses identified Munoz as the driver and shooter. The other witness testified that the driver was the shooter, but could not identify Munoz. Two other witnesses testified that they heard shots, but did not see the shooting. None of the witnesses testified that the shooter had been a passenger in the back seat.

Reyes did not want to snitch on his older cousin. During the interrogation, Reyes said, "Well, if I say something like

what's going to happen with my cousin? Is he still gonna go to jail? . . . He had nothing to do with it." Further, Reyes may well have thought that a confession would have limited adverse consequences for him. Before Reyes made his in-custody confession, Officer Heard had told him, "[Y]ou have my word I won't trick you," and "Fifteen-year-olds don't go to state prison, Adrian."

In sum, our opinion gives full deference under AEDPA to the decision of the California Court of Appeal. After careful consideration of the entire record and of the decision of the Court of Appeal, we conclude that the decision was "contrary to" *Seibert*, and that it was based on an unreasonable factual determination that the interrogating officers did not deliberately undermine the effectiveness of their belated *Miranda* warning.

---

CALLAHAN, Circuit Judge, with whom, O'SCANNLAIN, TALLMAN, BEA, and IKUTA, Circuit Judges, join, dissenting from the denial of rehearing en banc:

Fifteen-year-old Adrian Reyes confessed to killing sixteen-year-old Derek Ochoa in a drive-by shooting. He first confessed after acknowledging many times that he was not under arrest and was not required to talk, freely leaving two previous police interviews, taking a polygraph that he and his parents not only consented to but that Reyes initially suggested, and then asking to speak with detectives. After Reyes confessed, those detectives drove him to another location where they told him that he was no longer free to leave and read him his *Miranda* rights. He again confessed. A jury found Reyes guilty of first-degree murder. The state

appellate court affirmed, the California Supreme Court denied Reyes's petition for review, and the U.S. Supreme Court denied certiorari. In a supreme display of Ninth Circuit legerdemain, the panel majority reviewed *de novo*, found that Reyes's confession was obtained in violation of *Missouri v. Seibert*, 542 U.S. 600 (2004), and thus reversed the district court's denial of habeas relief. The panel truly conjured its magic from nothing—the panel did not watch the videos of the police interviews, Reyes argued to the state appellate court that a deliberate *Miranda* violation was not at issue, and Reyes never mentioned *Seibert* in federal court until the panel told him to.

Like the district court and state court judges, I disagree with the panel, which makes three errors of exceptional importance. First, the panel wrongly concludes that Justice Kennedy's subjective-intent requirement in *Seibert*, which seven other Justices rejected, is clearly established Supreme Court law. Second, the panel wrongly permits federal courts to read the worst into state court decisions on habeas review. Third, the panel wrongly requires all courts to presume the worst of police officers in applying *Seibert*. The panel's decision not only misunderstands *Seibert*, conflicts with our recent en banc decisions, and creates circuit splits, but also threatens to interfere with reasonable police work and let a confessed murderer walk.

I respectfully dissent from this court's failure to rehear this case en banc.

## I.

This case's background is important to understanding how far the panel strayed from the scope of its review under

the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). While the panel's coverage of this background is incomplete in other respects, I will only supplement the panel's depiction of Reyes's third police interview and this case's procedural history.

## A.  Factual background

Police officers questioned Reyes about Ochoa's murder on January 13, 2006, February 9, 2006, and February 10, 2006. Reyes was told that he was not under arrest at the first two interviews, and he left both interviews free. At the February 9th interview, Reyes offered to take a polygraph test.

The following day, Reyes voluntarily returned to the San Bernardino County Sheriff's station to take the polygraph test. Reyes's parents consented to the test, which Robert Heard, the San Bernardino Sheriff's polygrapher, administered. Heard first explained at great length that Reyes was not under arrest, and Reyes responded that he understood. Heard noted that Reyes's parents had given permission for Reyes to take the test but emphasized that "[t]he decision on whether or not Adrian is gonna take a polygraph exam is with Adrian. That's your decision. Okay?" Heard reiterated, "After we talk or at any time you can say you know what Bob? I ain't spillin', I don't wanna talk to you anymore. I wanna go. Just say so. You're out a here, you're gone, you with me?" Reyes said he understood. Heard walked Reyes through a consent form in detail. Reyes read part of the form aloud, stating "I understand that I cannot be forced to take this test. And you know what? I have the right at any time to leave . . . my examination room." Reyes confirmed that he understood the consent form and signed it.

After several "dry runs" during which Reyes contradicted his previous narrative by placing himself in the silver Toyota Camry involved in the shooting near the scene and time of Ochoa's murder, Reyes took the polygraph and denied involvement in the murder. Heard told Reyes that he failed the test. Heard continued questioning, appealed to the importance of telling the truth, and suggested that Reyes tell him if there were any mitigating circumstances. Reyes stated a few times that he didn't want to talk any more during the questioning that followed, but he never sought to end the interview and leave. Reyes asked what would happen if he didn't say anything. Heard responded that the investigation would continue—"They're gonna work it, and they're gonna put it together." Reyes later said he didn't want to talk "cause even if I say anything or if I don't, everybody[] that they got on the list is gonna do 25 years prison." Reyes asked, "So if I say who the shooter was, I'm still gonna go to jail?" Heard responded more than once that he did not have an answer to that question, though Heard had previously stated that fifteen-year olds don't go to state prison.

Reyes asked for some time and Heard offered to wait outside, but Reyes then said "No, it's alright." After Heard asked another question, Reyes responded "not that I know, you know, so don't ask any question." Heard asked Reyes if he wanted to be alone, and Reyes responded "No, it's just, just don't ask any questions." When Heard said he was not just going to sit there and do nothing, Reyes asked, "Can we just call the detectives?"

Shortly thereafter, in the same room, Detectives Brandt and Medici questioned Reyes. When Brandt asked whether Reyes was in the front passenger seat, Reyes stated "No, I'll say nothing, man." Reyes refused to identify the other person

in the car and stated that "we're still gonna do time in jail anyway." Detective Brandt responded that the jail time "may be minimal or it, it may be a lot, but like we told you yesterday, uh, people have, you have to tell the, the truth." Detective Brandt later asked Reyes how many 15-year olds he knew that went to jail for 25 years and why Reyes would be any different. Later in the interrogation, however, Reyes continued to acknowledge that he would do "25 years to life" if he shot Ochoa.

Not long after the Detectives began questioning, Reyes confessed that he shot Ochoa: "I just shot." As Ochoa approached the car, Reyes felt afraid and "got mad. [He] opened the door so he would like back up." Then he shot. As the panel majority observes, "Reyes's statement that he had shot Ochoa came early in the interview, on the seventh page of the transcript." Maj. Op. 48. After this confession, the detectives continued questioning and tried unsuccessfully to determine who else was involved.

After the interview at the San Bernardino Sheriff's station concluded, Detective Brandt drove Reyes back to the Riverside police station where Detectives Brandt and Medici again questioned Reyes. It is unclear how much time passed, but the panel states that the station was 15 miles away. At the beginning of the interview, Brandt explained that Reyes was no longer free to leave and thus Brandt was required to read Reyes his *Miranda* rights. After reading him his rights, Brandt then asked if they could "talk about stuff we talked about earlier today?" Reyes said yes. In the interrogation that followed, the detectives did not use the earlier interview to impeach Reyes. The only reference back was to an earlier statement by Reyes that Ochoa had thrown something at the

car.   Reyes admitted to shooting Ochoa but said Ochoa looked like he also had a gun.

## B.  Procedural background

Reyes was charged in California Superior Court with first-degree murder.  At the outset of the trial, Reyes sought to suppress the statements he had made to law enforcement on February 10, 2006.  Following an evidentiary hearing, the trial judge suppressed the statements Reyes made before being advised of his *Miranda* rights, finding that Reyes had been in custody.  The trial judge did not suppress the post-warning statements.  The jury found Reyes guilty of first-degree murder with gang and firearm enhancements.

Reyes appealed, claiming, among other things, that the trial court erred in admitting his post-warning confession. Reyes argued that "the coercive atmosphere of the involuntary statements was never dissipated" and that the "admonition of rights was too little, too late."  He did not argue that the detectives deliberately violated *Miranda*.  In fact, Reyes argued at length in his reply brief in the state appellate court that the State had incorrectly characterized *Seibert* as requiring "coordinated interrogation tactics designed to produce an unwarned confession."[1]   In other

---

[1] The State had argued in its answering brief that there was no *Miranda* violation and that *Seibert* was distinguishable because, among other reasons, "[t]here was no evidence of a police policy of coordinated tactics designed to produce an un-warned confession."  In one paragraph of his state habeas petition, Reyes argued that some tactics that the officers used, namely sneering and refusing to "respect petitioner's efforts to end the interrogation," were "deliberate" and "flagrant" misconduct.  But he did not argue that the officers employed a two-part interrogation in deliberate violation of *Miranda*, even after the State had addressed this issue.

words, according to Reyes, whether the officers deliberately employed a two-part interrogation tactic designed to undermine the import of subsequent *Miranda* warnings was not at issue.  Rather, the operative question, according to Reyes himself, was whether "appellant's post-polygraph statements were voluntary," and, if not, "whether the taint from the involuntary admissions was dissipated before the stationhouse admissions were made."

The state appellate court affirmed in a lengthy, reasoned decision.  *People v. Reyes*, No. D047521, 2010 WL 3026227 (Cal. Ct. App. Aug. 4, 2010).  Because it was uncontested that the detectives did not violate *Miranda* in bad faith, the state appellate court agreed with Reyes on the relevant legal inquiry.  The court explained, "[A]s defendant recognizes, the fact the interrogation at the sheriff's station was not accompanied by *Miranda* advisals does not invalidate the later *Mirandized* statements unless the later admissions were in fact involuntary or the tainted product of the initial statements or confession."  *Id.* at *12.  Applying this standard, the court determined that Reyes's pre- and post-warning confessions were voluntary and thus the post-warning confession was admissible.  The court distinguished *Seibert*, explaining that "the circumstances in the instant case need not 'be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that [he] retained a choice about continuing to talk.'"  *Id.* at *13 (alteration in original) (quoting *Seibert*, 542 U.S. at 616 (plurality opinion)).

Reyes sought review of the state appellate court's decision by the California Supreme Court.  In his briefs

before the California Supreme Court, Reyes did not mention *Seibert*. The California Supreme Court denied his petitions. The U.S. Supreme Court denied certiorari.

Reyes then filed a petition for habeas corpus in federal district court. In his briefs below, he again did not mention *Seibert*. Magistrate Judge Eick issued a 53-page report and recommendation that relief be denied. District Judge Feess adopted the report in full. Consistent with Reyes's arguments, and like the state appellate court, the district court focused on whether a reasonable jurist could conclude that Reyes's confessions were voluntary. However, the district court raised and distinguished *Seibert* because "there is no evidence that the law enforcement officers *deliberately* applied a two-step method, and the state courts reasonably concluded that Petitioner's post-warning statements were voluntarily made."

Reyes then appealed to the Ninth Circuit. On appeal, he did not cite *Seibert* or take issue with the district court's conclusion that the detectives had not employed a two-part interrogation in deliberate violation of *Miranda*. The panel nonetheless ordered "supplemental briefing on the applicability of [*Seibert*] to this case." Reyes's supplemental brief marked the first time that he clearly argued that the officers' "failure to warn . . . was not made in good faith and was . . . a deliberate attempt to deprive him of his constitutional rights." The panel reviewed *de novo* the *Seibert* argument that it directed Reyes to make and, after engaging in appellate fact-finding on a record that did not even include the videos of the police interviews, found it

persuasive.[2]  The panel thus reversed the district court's denial of habeas relief and ordered that relief be granted if Reyes is not retried for Ochoa's now ten-and-a-half-year-old murder.

## II.

In reversing the district court's denial of habeas relief, the panel committed three critical errors, any one of which should have prompted en banc review.

**A.  The panel wrongly concluded that Justice Kennedy's lone concurrence in *Seibert* is clearly established Supreme Court law.**

The panel's amended opinion holds that Justice Kennedy's lone concurrence in *Seibert* is clearly established law under the reasoning-based approach to applying *Marks v. United States*, 430 U.S. 188 (1977).  We recently adopted the reasoning-based or "common-denominator-of-the-reasoning rule" in *United States v. Davis*, — F.3d —, 2016 WL 3245043 (9th Cir. June 13, 2016) (en banc).  In *Davis*, we concluded that Justice Sotomayor's concurrence in *Freeman v. United States*, 564 U.S. 522 (2011), was not controlling under the reasoning-based rule because the *Freeman* plurality and dissent explicitly rejected the concurrence's reasoning. *Davis*, 2016 WL 3245043, at *6 ("The *Freeman* plurality explicitly rejected the concurrence's reasoning."); *id.* at *9 ("The *Freeman* dissent is similarly critical of Justice Sotomayor . . . ."); *see also id.* (emphasizing that "Justice

---

[2] The state appellate court and district court referenced videos of the interviews, but none was included in the record.  *Reyes*, 2010 WL 3026227, at *6.

Sotomayor explicitly" rejected the dissent's rule). We concluded that "[t]his fundamental divergence in reasoning is enough to demonstrate that Justice Sotomayor's rationale is not controlling Supreme Court law." *Id.* at *6. We explained that this conclusion is reinforced by the fact that there may be cases where relief would be granted under the concurrence's rule but not the plurality's rule. *Id.* at *6–7.

Applying the common-denominator-of-the-reasoning *Marks* rule to *Seibert*, other circuit courts have found that Justice Kennedy's *Seibert* concurrence is "obviously not the 'common denominator' that *Marks* was talking about." *United States v. Heron*, 564 F.3d 879, 883–87 (7th Cir. 2009); *see also United States v. Ray*, 803 F.3d 244, 270–72 (6th Cir. 2015). Just as the plurality and dissent expressly rejected elements of Justice Sotomayor's reasoning in *Freeman*, the plurality and dissent expressly (and even more emphatically) rejected Justice Kennedy's reasoning in *Seibert*. As the Sixth Circuit explained,"three of the four Justices in the plurality and the four dissenters decisively rejected any subjective good faith consideration, based on deliberateness on the part of the police."[3] *Ray*, 803 F.3d at 271 (quoting *United States*

---

[3] *See Seibert*, 542 U.S. at 616 n.6 (plurality opinion) ("[T]he focus is on facts apart from intent . . . ."); *id.* at 623 (O'Connor, J., dissenting) ("[T]he plurality correctly declines to focus its analysis on the subjective intent of the interrogating officer."); *id.* at 624 ("The plurality's rejection of an intent-based test is also, in my view, correct."); *id.* at 625–26 ("[R]ecognizing an exception to [*Oregon v. Elstad*, 470 U.S. 298 (1985)] for intentional violations would require focusing constitutional analysis on a police officer's subjective intent, an unattractive proposition that we all but uniformly avoid."); *id.* at 626–27 ("[T]he approach espoused by Justice Kennedy is ill advised . . . . This approach untethers the analysis from facts knowable to, and therefore having any potential directly to affect, the suspect.").

*v. Rodriguez-Preciado*, 399 F.3d 1118, 1139–41 (9th Cir. 2005) (Berzon, J., dissenting)); *see also United States v. Carrizales-Toledo*, 454 F.3d 1142, 1151 (10th Cir. 2006). Under the reasoning-based *Marks* rule, reasoning expressly rejected by at least seven Justices cannot be elevated to the status of controlling Supreme Court law.

As in *Davis*, this conclusion is reinforced by the fact that there are likely to be cases where relief would be granted under Justice Kennedy's test but not the plurality's test. The plurality's test is concerned with the effectiveness of the belated *Miranda* warnings. The plurality looks to "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Seibert*, 542 U.S. at 615. These and other objective facts are relevant to assessing whether "a reasonable person in the suspect's shoes would [] have understood [the *Miranda* warnings] to convey a message that she retained a choice about continuing to talk." *Id*. at 617. By contrast, Justice Kennedy looks first to whether the police deliberately violated *Miranda* and, if so, whether the officers used "curative measures . . . before the postwarning statement is made," such as "an additional warning that explains the likely inadmissibility of the prewarning custodial statement." *Id.* at 622.

There are likely to be cases involving deliberate *Miranda* violations where most of the plurality's "effectiveness factors" are met but, because no explanation of the pre-warning statement's inadmissibility or other "specific, curative step" was taken, Justice Kennedy's curative

measures requirement isn't. Similarly, there are likely cases involving deliberate violations where Justice Kennedy's curative-measures requirement is met because "specific, curative steps" were taken, such as a warning that the pre-*Miranda* confession could not be used against the suspect, but the plurality's effectiveness requirement isn't. For example, the plurality's effectiveness requirement may not be satisfied because of "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, [and] the continuity of police personnel." *Id*. at 615.

It is true that some courts have held that Justice Kennedy's concurrence is controlling. However, just as the *Davis* opinion observed in distinguishing other circuits' treatment of *Freeman*, all of these courts "engage with *Marks* only superficially, quoting its language with no analysis," *Davis*, 2016 WL 3245043, at *8, and apparently applying a results-based *Marks* rule.[4] It is clear that the panel's amended opinion creates an additional circuit split on how the

---

[4] *United States v. Carter*, 489 F.3d 528, 535–36 (2d Cir. 2007) (without mentioning *Marks*, summarily ruling that *Seibert* established an exception to *Elstad*); *United States v. Torres-Lona*, 491 F.3d 750, 758 (8th Cir. 2007) (concluding without explanation that Justice Kennedy's concurrence is controlling because it is "narrower"); *United States v. Courtney*, 463 F.3d 333, 338 (5th Cir. 2006) (same); *United States v. Street*, 472 F.3d 1298, 1313 (11th Cir. 2006) (same); *United States v. Naranjo*, 426 F.3d 221, 231–32 (3d Cir. 2005) (same); *United States v. Mashburn*, 406 F.3d 303, 308–09 (4th Cir. 2005) (same).

reasoning-based *Marks* rule applies to *Seibert*. *See Ray*, 803 F.3d at 267–73; *Heron*, 564 F.3d at 883–87.**[5]**

Evidently, the upshot of our en banc decision in *Davis* is that fractured Supreme Court decisions like *Seibert* are binding on state courts but not on us. But the panel's conclusion that *Seibert* is binding on state courts is even more questionable under AEDPA. At the very least, the "fair-minded disagreement" between circuit courts on whether *Seibert* created any controlling rule, shows that Justice Kennedy's deliberateness requirement is not "clearly established law" within the meaning of AEDPA.**[6]** *See White v. Woodall*, 134 S. Ct. 1697, 1703 (2014); *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011).

## B. The panel violated AEDPA by presuming that the state appellate court did not understand and follow clearly established law.

Even if Justice Kennedy's concurrence were clearly established Supreme Court law, the panel violated AEDPA. The panel majority deemed itself unfettered by AEDPA

---

**[5]** The Tenth Circuit similarly questioned whether *Seibert* established a controlling rule, but found it unnecessary to reach the issue. *Carrizales-Toledo*, 454 F.3d at 1151. The First and D.C. Circuits have also expressed skepticism. *United States v. Straker*, 800 F.3d 570, 617 (D.C. Cir. 2015); *United States v. Verdugo*, 617 F.3d 565, 575 (1st Cir. 2010).

**[6]** The panel's statement that the Sixth Circuit found the *Seibert* plurality opinion controlling in *Ray* is wrong. In *Ray*, the Sixth Circuit found that *Seibert* did not establish a controlling rule, and then chose to adopt as binding the rule articulated by the four-Justice plurality. *Ray*, 803 F.3d at 272. The panel fails to understand that a fractured Supreme Court decision that did not establish a controlling rule is not clearly established Supreme Court law under AEDPA.

because, in its view, the state appellate court's decision did not expressly make a finding regarding the deliberateness element of Justice Kennedy's test in *Seibert*. However, the state appellate court's decision is readily reconciled with *Seibert*.

First, several parts of the state appellate court's decision may be read to acknowledge expressly that the detectives did not deliberately violate *Miranda*. The court found "no evidence that defendant was coerced into waiving his rights," and explained that Detective Brandt "advise[d] [Reyes] of his *Miranda* rights before questioning him further" at the police station because Brandt no longer regarded Reyes as being "free to leave." *Reyes*, 2010 WL 3026227, at *6, 13. The state appellate court also distinguished *People v. Neal*, 31 Cal. 4th 63, 80–81 (2003), "in which a police detective intentionally continued interrogation in deliberate violation of *Miranda*." *Id.* at *9. Moreover, the state court's decision tacitly acknowledges, as the record confirms, that Reyes did not even contend that the officers violated *Miranda* in bad faith. The court explained that, accordingly, "*as defendant recognizes*, the fact the interrogation at the sheriff's station was not accompanied by *Miranda* advisals does not invalidate the later *Mirandized* statements unless the later admissions were in fact involuntary or the tainted product of the initial statements or confession." *Id.* at *12 (emphasis added). This is the correct inquiry under Justice Kennedy's *Seibert* test in cases where it is undisputed that the officers did not violate *Miranda* in bad faith.[7]

---

[7] The panel fundamentally misses the point of *Seibert* and *Elstad* in arguing that "that the test for admissibility of a confession is not whether it was voluntary [but] whether it was taken in violation of *Miranda*." Concurrence at 3. Again, even where a pre-warning interview was

The panel does not attempt to address this textual evidence that the state court correctly understood the law. In any case, such parsing of sentences in the state court's decision takes us beyond our role under AEDPA. Even if the decision were silent or ambiguous on whether the detectives deliberately violated *Miranda*, *de novo* review is still foreclosed. Under controlling Supreme Court precedent, we must presume "state courts know and follow the law," give state courts "the benefit of the doubt," and make an "effort to reconcile" the reasoning of state courts with controlling Supreme Court rules. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002); *see also Renico v. Lett*, 559 U.S. 766, 773 (2010); *Lindh v. Murphy*, 521 U.S. 320, 333, n.7 (1997); *Poyson v. Ryan*, 743 F.3d 1185, 1199 (9th Cir. 2013), *as amended* (Apr. 2, 2014) ("AEDPA does not allow us to presume from an ambiguous record that the state court applied an unconstitutional standard."), *overruled on other grounds by McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015) (en banc). Like its first major error, the panel's second error also conflicts with a recent en banc decision of this court. The panel majority's reasoning is clearly irreconcilable with our rule in *Mann v. Ryan*, — F.3d —, 2016 WL 3854234, at *11 (9th Cir. July 15, 2016) (en banc), that if "we can read the [state court] decision to comport with clearly established federal law, we must do so."

Second, as Judge Singleton explained in his concurrence in this case, the state court's analysis can also be reconciled with *Seibert* if the decision is read to have found that the

custodial and thus administered in violation of *Miranda*, a post-warning confession remains admissible under Justice Kennedy's concurrence so long as the officers did not deliberately violate *Miranda* and the confession was voluntary.

*Miranda* warnings were effective. The state court made the following finding in distinguishing *Seibert*:

> Unlike in *Missouri v. Seibert* (2004) 542 U.S. 600, 616, the circumstances in the instant case need not "be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that [he] retained a choice about continuing to talk." (*Id.* at p. 616.)

*Reyes*, 2010 WL 3026227, at *13. This finding of effectiveness provides an additional ground for distinguishing *Seibert*, even assuming that the detectives deliberately violated *Miranda*. Under either ground, the panel majority erred in "free[ing] itself from AEDPA's strictures." *Kernan v. Hinojosa*, 136 S. Ct. 1603, 1605 (2016) (per curiam). As explained below, we need not reach the question whether the state appellate court's effectiveness finding was an objectively unreasonable application of *Seibert* because a reasonable jurist could conclude that any *Miranda* violation was unintentional.

**C. The panel wrongly presumed that the police violated *Miranda* in bad faith, and conflated the deliberateness of a *Miranda* violation with the effectiveness of a subsequent *Miranda* warning.**

Even if *de novo* review were appropriate, the panel's decision misinterprets *Seibert* and creates bad law on how courts should assess whether police officers deliberately violated *Miranda*.

The panel begins its analysis of whether the detectives deliberately violated *Miranda* by stating, "'the most plausible reason' for delaying *Miranda* warnings until after a suspect has confessed 'is an *illegitimate* one, which is the interrogator's desire to weaken the warning's effectiveness.'" Maj. Op. 67 (quoting *United States v. Williams*, 435 F.3d 1148, 1159 (9th Cir. 2006)). The panel's presumption of bad faith is contrary to Justice Kennedy's concurrence in *Seibert*, effectively overrules *Elstad*, and removes a habeas corpus petitioner's burden of proving a constitutional violation. *See Thompson v. Runnels*, 657 F.3d 784, 788–91 (9th Cir.) (Callahan, J., dissenting from denial of rehearing en banc) (explaining that "contrary to the majority's assertion, . . . *Seibert* did not overrule *Elstad*"), *vac'd sub nom. McEwen v. Thompson*, 132 S. Ct. 578 (2011).

As the State points out, nothing in *Seibert* "suggests that it is necessary or proper to presume wrongdoing on the part of police." Justice Kennedy explained that his test would apply only "in the infrequent case" where detectives deliberately violated *Miranda*. *Seibert*, 542 U.S. at 622. He emphasized that in most cases "[t]he admissibility of postwarning statements should continue to be governed by the principles of *Elstad*." *Id*. He "suggested a number of plausible reasons why an officer might legitimately wait to deliver *Miranda* warnings, including that '[a]n officer may not realize that a suspect is in custody and warnings are required.'" *United States v. Stewart*, 536 F.3d 714, 720 (7th Cir. 2008) (alteration in original) (quoting *Seibert*, 542 U.S. at 620 (Kennedy, J., concurring in the judgment)).

Other circuits have rightly refused to presume that police officers act in bad faith. *See, e.g.*, *id*. at 720–21; *Carrizales-Toledo*, 454 F.3d at 1153 (concluding that there was no

deliberate two-step interrogation because "it is likely that [the officer] failed to provide the *Miranda* warning because at that point it was unclear whether [the suspect] was in custody"). Indeed, the Supreme Court has admonished that "the task of defining 'custody' is a slippery one, and police[ officers] investigating serious crimes [cannot realistically be expected to] make no errors whatsoever." *Elstad*, 470 U.S. at 309 (second alteration in original).    Where police officers engrossed in the moment mistake the difficult line between custodial and non-custodial interviews, we will not suppress subsequent warned and voluntary "admissions of guilt by wrongdoers, [which] are inherently desirable." *Id.* at 305 (quoting *United States v. Washington*, 431 U.S. 181, 187 (1977)).

The panel also misconstrued *Seibert*, collapsed the plurality and concurrence's tests, and effectively overruled *Elstad* by conflating the issue of whether the detectives deliberately violated *Miranda* with the issue of whether the midstream-*Miranda* warning was effective.  The majority found indicative of deliberateness the facts that the pre-warning and post-warning confessions overlapped in content, the detectives did not take specific curative measures, and there was overlap in personnel.  These facts do not pertain to the subjective intent of the detectives; they pertain to assessing whether "a reasonable person in the suspect's shoes would . . . have understood [the midstream-*Miranda* warnings] to convey a message that she retained a choice about continuing to talk." *Seibert*, 542 U.S. at 617 (plurality opinion).

At best, such evidence is neutral on whether detectives deliberately violated *Miranda*.  For example, the fact that "Reyes provided essentially the same information," Maj. Op.

69, during the warned and unwarned interrogations has little bearing on whether the detectives deliberately violated *Miranda*. Of course Reyes's pre-warning confession to murdering Ochoa overlapped with his post-warning confession to murdering Ochoa. How could it be otherwise? If "there was no earlier confession to repeat," *Seibert* would not apply and we would not need to consider deliberateness. *Bobby v. Dixon*, 132 S. Ct. 26, 31 (2011) (per curiam). Similarly, the fact that "Brandt did not take curative measures," Maj. Op. 70, is relevant to whether the midstream-*Miranda* warning was effective. But this fact does not show that detectives who clearly endeavored to create a non-custodial interview employed a two-part interrogation in deliberate violation of *Miranda*. If the detectives thought the pre-warning interview was non-custodial, then they would have thought such "corrective measures" to have been unnecessary. The panel's view that Brandt "played down" the importance of the *Miranda* warnings by stating that he wanted "just to clarify stuff," *id.*, also is relevant to whether the midstream-*Miranda* warning was effective. But such statements do not establish a deliberate *Miranda* violation. Again, if the detectives thought the pre-warning interview was non-custodial, they would have seen no problem with referencing it. As Justice Kennedy noted, "Skilled investigators often interview suspects multiple times, and good police work may involve referring to prior statements to test their veracity or to refresh recollection." *Seibert*, 542 U.S. at 620.

The panel also found the fact that the "three Riverside police officers involved in the case—Brandt, Wheeler and Medici—were all experienced officers" to evidence a deliberate *Miranda* violation. Maj. Op. 69. But the fact that the officers were seasoned is just as likely to evidence that

they understood *Miranda* and endeavored to keep the interview non-custodial.  Similarly, the fact that the detectives "obtained the incriminating information from Reyes very early in the unwarned custodial interrogation," Maj. Op. 70–71, does not evidence a deliberate *Miranda* violation.  Rather, that Reyes quickly confessed once the detectives entered, at Reyes's request, shows that the officers would have had little reason to believe that Reyes no longer felt free to leave and thus that the interview had become custodial.

Inexplicably, the panel went as far as to attribute bad faith to the detectives because they questioned Reyes "in a nonconfrontational, sympathetic way, with the result that Reyes was made to feel . . . comfortable . . . and laugh[]." *Id*. As explained below, this fact and many others that the panel ignored show that a reasonable jurist could find that the detectives did "not realize that [the] suspect [was] in custody and warnings [were] required," which is a good-faith reason for not delivering *Miranda* warnings earlier.  *Seibert*, 542 U.S. at 620 (Kennedy, J., concurring in the judgment).

**D. The state appellate court and federal district court correctly found that the detectives did not deliberately violate *Miranda* and that Reyes's post-warning murder confession was admissible.**

Under AEDPA, the state court's determination that no *Miranda* violation occurred is entitled to deference and should be upheld as long as "fairminded jurists could disagree" on the correctness of the state court's decision. *Harrington*, 562 U.S. at 101.  Even if *de novo* review applied here, however, the panel erroneously concluded that the detectives deliberately violated *Miranda*.  The weight of

objective and subjective evidence favors the view that the reason that the pre-warning interview was unwarned is that the officers believed that Reyes was not in custody. After all, Reyes was repeatedly told that he was not under arrest and was free to leave, left two previous interviews free, requested the polygraph interview, consented to it verbally and in writing, and then asked to speak to the detectives after its conclusion. Under applicable case law, these facts and many others weigh strongly in favor of the view that the officers reasonably viewed the pre-warning interview to have been non-custodial.

For example, following the Supreme Court, "[w]e have consistently held that a defendant is not in custody when officers tell him that he is not under arrest and is free to leave at any time," *United States v. Bassignani*, 575 F.3d 879, 886 (9th Cir. 2009), as the officers here repeatedly told Reyes.[8] Courts have also consistently held that the fact that a defendant came to the police station voluntarily, as Reyes did here, weighs in favor of the view that he was not in custody. *Beheler*, 463 U.S. at 1122 (noting that the suspect "voluntarily agreed to accompany police to the station

---

[8] *See also Howes v. Fields*, 132 S. Ct. 1181, 1185 (2012) ("Most important, respondent was told at the outset of the interrogation, and was reminded again thereafter, that he could leave . . . ."); *California v. Beheler*, 463 U.S. 1121, 1122 (1983) (per curiam); *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977); *United States v. Crawford*, 372 F.3d 1048, 1060 (9th Cir. 2004) (en banc) ("Perhaps most significant for resolving the question of custody, Defendant was expressly told that he was not under arrest . . . ."); *Dyer v. Hornbeck*, 706 F.3d 1134, 1136–40 (9th Cir. 2013); *United States v. Norris*, 428 F.3d 907, 912 (9th Cir. 2005).

house").[9] Courts have also held that the fact that a defendant consented in writing to a polygraph test, as Reyes did here, is powerful evidence that the defendant was not in custody. *People v. Ochoa*, 19 Cal. 4th 353, 402 (Cal. 1998).

Still other objective facts support the view that the detectives reasonably believed that Reyes did not view himself to be in custody. For example, the detectives released Reyes after two previous interviews. *See, e.g.*, *Beheler*, 463 U.S. at 1122 (emphasizing that "Beheler was permitted to return to his home"). The officers did not restrain Reyes in the exam room or yell at him. They permitted Reyes to give narrative answers and "appealed to his interest in telling the truth and being helpful." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). These are all signs that the officers endeavored to keep the pre-warning interview non-custodial, not to violate *Miranda* in bad faith.

Moreover, the panel concedes that there is no subjective evidence that the detectives deliberately violated *Miranda*. There is, however, subjective evidence that they did not. As the state appellate court observed, Detective Brandt stated before giving the *Miranda* warnings that the warnings were now required because Reyes was no longer free to leave. *Reyes*, 2010 WL 3026227, at *6. The clear implication is that Detective Brandt did not believe that the warnings were required earlier because he believed the earlier interview was non-custodial.

---

[9] *See also Mathiason*, 429 U.S. at 495 ("He came voluntarily to the police station . . . ."); *Crawford*, 372 F.3d at 1059 (emphasizing that the defendant "agreed to accompany" the officers).

It is true that some circumstances were indicative of custody and thus lend some support to the view that the officers knew that the pre-warning interview had turned custodial.  In its analysis, the panel oddly does not mention the strongest of such evidence, that Reyes intermittently stated that he did not want to answer particular questions. Reyes, however, never sought to terminate the interview and leave.    Especially given that Reyes had previously acknowledged many times that he could terminate the interview and leave, and had left two previous interviews free after intermittently declining to answer questions, the fact that the officers continued questioning him is not dispositive of a deliberate *Miranda* violation. Moreover, as the state appellate court emphasized, Officer "Heard ultimately terminated the postpolygraph questioning upon defendant's request." *Id.* at *8.  Reyes then asked to speak with the detectives, not to leave.  Indeed, the transcripts suggest that Reyes remained because he was fishing for a deal.

Similarly, I cannot conclude on AEDPA or clear error review that the officers employed a two-part interrogation in deliberate violation of *Miranda* simply because the officers questioned Reyes's veracity, confronted him with evidence of his guilt, and suggested leniency.  *See, e.g.*, *Mathiason*, 429 U.S. at 493 (officers told the suspect that his fingerprints had been found at the scene and that "his truthfulness would possibly be considered by the district attorney or judge"); *Stansbury v. California*, 511 U.S. 318, 325 (1994) (telling a person he is a "prime suspect" does not necessarily mean he is under arrest because "some suspects are free to come and go until the police decide to make an arrest").

Again, this is not to say that the pre-warning interview could not reasonably be viewed as custodial; that 20–20

hindsight legal conclusion made by judges is not at issue. What is at issue is whether officers engrossed in the moment knew that the interview had become custodial but deliberately pressed on to undermine the effect of subsequent *Miranda* warnings. It bears repeating that *Miranda* warnings need be given only once a suspect is in custody. There is nothing wrong with officers seeking to question a suspect in a non-custodial situation. Rather, this may be viewed as good police work. So long as the officers believed that the interview remained non-custodial, where they turned out to be mistaken, a subsequent, warned confession must be allowed into evidence if voluntarily given. Here, a reasonable jurist could conclude, as did the state appellate court and the district court, that the detectives did "not realize that [Reyes was] in custody and warnings [were] required." *See Seibert*, 542 U.S. at 620 (Kennedy, J., concurring in the judgment).

Because any *Miranda* violation by the detectives was not deliberate, the operative question under *de novo* review, as the state courts, the district court, the prosecution, and Reyes correctly recognized, is whether Reyes's post-warning confession is admissible under *Elstad*. Under *Elstad*, "[t]he relevant inquiry is whether, in fact, the second statement was also voluntarily made." *Elstad*, 470 U.S. at 318. The state appellate court and the district court explained in detail why both the pre-warning and post-warning confessions were voluntary, and thus the post-warning confession was admissible. *Reyes*, 2010 WL 3026227, at *8–14. I will not repeat those courts' exhaustive analyses here. I note only that the state appellate court's conclusion that Reyes's confessions were voluntary must be given even "more leeway" on AEDPA review given the inquiry's open-ended nature. *See Alvarado*, 541 U.S. at 664; *Harrington*, 562 U.S. at 102

("[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable."). The panel majority has not conducted this inquiry, which should have been the focus of its analysis from the start given the absence of bad faith by the detectives.[10]

## III.

The panel's decision conflicts with AEDPA, Supreme Court precedent, other circuits' precedent, our recent en banc decisions, and *Seibert* itself. Moreover, the panel is wrong in finding that Detective Brandt, Detective Wheeler, and Officer Heard violated *Miranda* in bad faith. Our failure to go en banc has consequences. Courts in our circuit will be permitted to read the worst into state court decisions and required to presume the worst of police officers in assessing

---

[10] The panel suggests that Reyes might not have been the triggerman, noting that two witnesses testified that the driver was the shooter. This suggestion not only epitomizes the type of second-guessing by our court that AEDPA is designed to limit, but also inaccurately characterizes the record. One of these two witnesses stated that the initial shots that hit Ochoa came from inside the car and then the driver stepped around the car and fired additional shots. Another witness testified that he heard gunshots and then saw a passenger get out of the back of the car and approach Ochoa. All of this, of course, went to the jury, but the panel apparently thinks itself capable of finding facts based on an incomplete, cold record. The panel's suggestion that Reyes was an innocent passenger who took the fall for his older cousin is further undercut by the fact that Reyes voluntarily confessed after acknowledging several times that he would do "25 years to life" for shooting Ochoa. Moreover, Reyes's guilt is beyond reasonable dispute. The evidence presented at trial shows overwhelmingly that Reyes and his cousin set out in Reyes's aunt's car to exact revenge on a rival neighborhood in retaliation for an assault on Reyes the previous day. They came across Ochoa and killed him in a drive-by as he waited outside of his house for his parents to take him to school.

whether a confession was constitutionally obtained. Reasonable police work will be disrupted. The decision effectively forces officers to tell wrongdoers that their pre-warning admissions may not be used against them, even where the officers do not believe that the pre-warning interview had become custodial. The State will be required to retry a confessed murderer to secure justice. Its ability to succeed is uncertain given the decade that has passed since Ochoa's murder.

For these reasons, I dissent from our failure to take this case en banc.

---

BEA, Circuit Judge, with whom O'SCANNLAIN, Circuit Judge, joins as to paragraphs 1 and 4, dissenting from the denial of rehearing en banc:

**1.** I join Judge Callahan's dissent from the denial of rehearing en banc.

**2.** I write separately to reiterate my view that *United States v. Davis*, __ F.3d __, 2016 WL 3245043 (9th Cir. June 13, 2016) (en banc), was wrongly decided. As I explained in my *Davis* dissent, *id.* at *15–*18 (Bea, J., dissenting), *Marks v. United States*, 430 U.S. 188 (1977), requires that we apply a "results-based" approach, not a "reasoning-based" approach, when interpreting splintered Supreme Court decisions.

**3.** Had my view commanded a majority of the *Davis* en banc Court, I would likely agree with the panel that Justice Kennedy's concurring opinion in *Missouri v. Seibert*,

542 U.S. 600 (2004), provides a controlling rule. In my *Davis* dissent, I cited with approval *United States v. Williams*, 435 F.3d 1148, 1157–58 (9th Cir. 2006), which applied a *results*-based approach and concluded that "both the [*Seibert*] plurality and Justice Kennedy agree that where law enforcement officers *deliberately* employ a two-step interrogation to obtain a confession and where separations of time and circumstance and additional curative warnings are absent or fail to apprise a reasonable person in the suspect's shoes of his rights, the trial court should suppress the confession." However, I agree with Judge Callahan that, under the *reasoning*-based approach adopted in *Davis*, *Williams* should be revisited. *See* Callahan Dissent at 18–22; *see also United States v. Rodriguez–Preciado*, 399 F.3d 1118, 1138–43 (9th Cir. 2005) (Berzon, J., dissenting).

**4.** I also wish to underline two AEDPA-related points made by Judge Callahan in her dissent. *First*, our conclusion that Justice Kennedy's concurring opinion in *Seibert* provides a controlling rule—right or wrong—is not "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Even if *we* are bound by Justice Kennedy's concurring opinion in cases on direct review, there is a "possibility for fairminded disagreement" regarding the controlling effect of that opinion, such that it may not control in cases, such as this one, in which AEDPA applies. *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see* Callahan Dissent at 19–22 (noting that other federal courts of appeals have found that Justice Kennedy's concurring opinion in *Seibert* does *not* provide a controlling rule). *Second*, we must give state courts "the benefit of the doubt" and attempt to reconcile the California Court of Appeal's decision with *Seibert*. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam). As Judge

Callahan discusses, we can do so by reading the state-court decision to "acknowledge expressly that the detectives did not deliberately violate *Miranda*." Callahan Dissent at 23. Of course, whether the detectives acted with deliberation is quintessentially a factual issue. As Judge Callahan explains, a finding by the California Court of Appeal that the detectives did not deliberately violate *Miranda* was not "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see* Callahan Dissent at 29–34.

**5.** For these reasons, I join Judge Callahan's dissent with the caveat that I continue to believe *Davis* was wrongly decided.

---

### OPINION

W. FLETCHER, Circuit Judge:

Petitioner Adrian Reyes petitions for a writ of habeas corpus on the ground, *inter alia*, that his state-court conviction rested on a confession obtained in violation of *Missouri v. Seibert*, 542 U.S. 600 (2004). For the reasons that follow, we reverse the district court and remand with instructions to grant the writ.

### I. Factual Background

On January 11, 2006, an armed person exited a silver Toyota Camry and shot Derek Ochoa three times. The person may have yelled "Delhi" (the name of an Orange County

gang).  Ochoa died as a result of the shooting.  He was a senior at La Sierra High School in Riverside County.

Riverside Police Department officers traced the Camry to the home of Andres Munoz, an older cousin of petitioner Adrian Reyes.  The car was registered to another member of the Munoz family, Albert.  Reyes had recently moved to Riverside County from Orange County.  He was a freshman at La Sierra.  He was not quite two months past his fifteenth birthday.

The day before the shooting, Reyes had been walking home from school with a friend.  A carload of gang members drove up and asked Reyes where he was from.  Reyes answered "Delhi."  One of the gang members punched Reyes in the eye.  They then drove away, yelling "South Side Riverside 51-50."

Two days after the shooting, Riverside Police Department homicide detectives James Brandt and Rick Wheeler questioned Reyes at his aunt's home.  Reyes had moved from his family's home to his aunt's home the day after his assault by the gang members.  The detectives' questions related primarily to the assault.  During the questioning, Reyes acknowledged that he had known Ochoa and that he knew Delhi was a "group in Santa Ana."

Nearly a month later, on February 9, sometime between 5:20 and 5:30 in the morning, a SWAT team of between fifteen and twenty officers executed a search warrant on Reyes's aunt's home.  They handcuffed Reyes and searched the house.  In Reyes's bedroom they discovered papers with "Delhi" written in large block letters.  After the house was

secured, Reyes was released from handcuffs and allowed to eat breakfast.

Brandt told Reyes that he was not under arrest, but that he wanted to ask him some questions at the station. Reyes acquiesced, and he was driven to the Riverside police station. Reyes was not accompanied to the station by any family member. At the station, Brandt and Wheeler together questioned Reyes. At no point during their questioning on February 9 did they provide *Miranda* warnings.

Reyes was held at the station for some time before he was questioned. Wheeler began the interview by saying, "Thanks for being so dang patient man I appreciate you . . . [h]anging out for us 'cause it's been a long day, long day." Wheeler told Reyes that he could stop the interview at any time: "I just wanna make sure that you understand that if we get at some point in the interview that you're done talkin' . . . and you don't feel like answering any more questions or whatever, let me know, okay?"

Wheeler asked briefly about the assault the day before the shooting. He then asked about the shooting. He said that the search warrants had been executed and that they had talked "with all these different people." "[W]e got pictures, too, . . . and I've had more than one person say that's the car that the guy was in, okay? . . . I've got enough information that shows that you were there." (Wheeler's statement was false. The only witness who had made any type of identification had not identified Reyes.) According to the transcript, Wheeler was interrupted by the "sound of sniffing." Wheeler continued, "[T]here's no denying it. . . . [T]he truth is gonna come out and, and I already know what it is." Reyes denied that he was there. "I didn't go out that day you could ask my Mom, you

would ask anybody in my home I didn't come out that day, I was sleeping." When Wheeler said that the police had spoken to his family already, Reyes said, "Don't you guys have a lie detector or something? I, I was in my house."

Brandt then took over the questioning. He challenged Reyes, saying that he had his phone records. "When your phone is being used basically six, seven, eight times an hour every, you know, on an average every five minutes so you're not sleeping okay?" Brandt was interrupted by the "sound of sniffing." Brandt suggested a mitigating version of events: "There is a big difference between being in the car when this thing happens . . . and being the shooter and stuff. . . . So just tell us what happened, okay?" "We've done our homework, dude and . . . don't screw yourself and lie to us, seriously, tell us what happened."

Wheeler and Brandt pressed Reyes on the inconsistency between Reyes's statements and his phone records. Wheeler asked him about the papers found in his room with "Delhi written in big letters." Brandt said, "We work homicide, alright, we gonna do our homework, definitely, I'm telling you, we have the car, we have the gun, we have five guns total. . . ." (Brandt's statement was false. The Sheriff's Department had not recovered—indeed, never did recover—the gun used to shoot Ochoa.)

Wheeler and Brandt continued to press Reyes. Brandt said, "[T]here's another detective was out showing witnesses the picture . . . 'cause we had a picture of you." Wheeler immediately followed, "And we identified you as being in the car." (Wheeler's statement was false. Reyes had not been identified by anyone as having been in the car.) Brandt said, "I'm not trying to trick you and . . . I'm not making the stuff

up that I'm telling you . . . . [S]o you know I'm not trying to trick you."

Brandt talked about Ochoa's family and their "right to understand what happened." Reyes responded, "I don't really want to say nothing no more . . . trying to cooperate here." (Elision in original.) Brandt replied, "You're not cooperating." Brandt was interrupted multiple times by the "sound of sniffing." A moment later, Brandt said, "Tell me what happened." Reyes responded, "I don't know nothing man."

Reyes said, "Stop asking me questions." Brandt said, "No I'm not gonna stop asking you questions." Brandt was again interrupted by the "sound of sniffing."

Brandt said, "[A]re you willing to take a polygraph examination?" Reyes responded, "Yeah." Brandt elaborated, "About everything." Reyes responded, "I guess, man, I don't know nothing man." Reyes mentioned that he might need to have his parents there, but Brandt interrupted him, saying, "[W]e'll certainly arrange for all that stuff just seeing that you're willing to . . . do it."

A moment later, Reyes said, "You guys stop asking me . . . kinda questions." (Elision in original.) "Stop[] asking this kind of stuff man." Wheeler, who had begun the interview by telling Reyes that he could stop at any time, did not stop. He responded to Reyes, "The only rope that you got is me throwing it to you right now and telling you 'you gotta be clean' because you haven't been. This thing's gonna burn you down."

Wheeler persisted, interrupted frequently by the "sound of sniffing." Reyes continued to indicate that he did not want to talk. "I've got nothing to say man." Brandt took over the questioning: "Okay, so witnesses identifying you and other people in the car identifying you, . . . you're good with that? . . . You want us to go in there with this two-hour conversation of you just lying about where you were when your phone records show it's not the case and all that stuff, you're comfortable with that." Reyes replied, "Stop asking me man. I don't know nothing."

Brandt terminated the interview, saying, "This time when I walk out I'm not gonna come back and give you another shot, okay? We're gonna, we'll, we'll go to the D.A.'s office and, and then later on to court with the case we have and, and I'm, I'm not worried about it, I'm not gonna lose." Wheeler added, "Oh ya, we're not gonna lose that case." Brandt said, "Last chance." Reyes responded, "I don't know nothing man."

The transcript of the February 9 interview does not indicate start and stop times, but it is apparent from Brandt's statement referring to "this two-hour conversation," quoted above, that the interview took about two hours. Brandt testified at Reyes's preliminary hearing that the interview had taken "forty minutes to an hour," but his testimony is inconsistent with what he himself said during the interview and with the length of the transcript. The interview was interrupted thirty-three times by the "sound of sniffing."

Reyes went to his mother's house to sleep that night. The next morning, Brandt and Michael Medici, another Riverside Police Department detective, picked up Reyes and took him to the San Bernardino County sheriff 's station for a

polygraph test. There is no written consent by an adult to the polygraph test. Brandt testified at the preliminary hearing that Reyes's mother gave permission "on the phone," and the record contains a police report stating that she had given permission. No family member accompanied Reyes to the sheriff's station.

Robert Heard of the San Bernardino County Sheriff's Department administered the polygraph test. Before administering the test, Heard spoke with Reyes for a sustained period. He impressed on Reyes the fact that he was an experienced test administrator. He recounted that he had gone to "polygraph school" "9 years before you were born," and that he was in high demand as a polygraph teacher. At no point did Heard provide *Miranda* warnings.

Reyes had difficulty filling out a form Heard gave him, not knowing his zip code or his height and weight. Reyes had even more difficulty with the written consent form. When he did not understand the terms "duress and coercion" and "immunity," Heard explained them in simpler language. Reyes had particular trouble understanding what was meant by the sentence, "I hereby release the County of San Bernardino, the Sheriff's Department and Examiner administering this examination from any and all claims resulting from, or arising out of, this examination. . . ." After Heard explained what "release . . . from any and all claims" meant, Reyes said, "Alright, so that, that means like that you guys won't, won't trick me . . . ." Heard corrected him, saying, "Well, no, this doesn't say I won't trick you." Heard then added, "[Y]ou have my word I won't trick you." Heard again explained what "release" meant, and said, "That's what it means." Reyes responded, "Like you haven't tricked me or

something."     Heard replied, "Exactly, exactly."     Thus
informed, Reyes signed the consent form.

After administering the test, Heard told Reyes, "You
failed the test.  I have no doubt that you were there when
Derek was shot."  (There is nothing in the record to indicate
whether Reyes had in fact failed the test.)  Heard pressed
Reyes to give details about what he had done.  Reyes asked,
"[L]ike what's the truth gonna help?"  Heard answered:

> [T]hey read my report and the detectives, their
> supervisor reads the report. . . . And the
> District Attorney's gonna ask these detectives
> hey, how was Adrian?  Is he one of these, you
> know tough, gang banger type guys[]?  No,
> no.     Adrian's a nice young man.     He
> cooperated, failed the test, and without
> hesitation he says hey, look, man, I feel bad
> about what happened. . . . Adrian, I can't tell
> you what's gonna happen because you know
> what?  I don't know.  I don't[] know what's
> gonna happen because you haven't told me
> what happened out there. . . . [Y]ou tell me
> I'm going to state prison for, I, I, said 25 to
> life or something like that.  Fifteen year olds
> don't go to state prison, Adrian.

Reyes responded, "I know, but I've got a go to Juvenile
Hall."   Heard replied, "Well, I don't know what's gonna
happen because I, you haven't told me anything yet, Adrian."

Heard continued to ask Reyes what happened, and Reyes
repeated several times that he did not know.  Heard asked
from what side of the car the shooter had shot.  Reyes

responded, "Oh, not that I know, you know, so don't ask any question." Heard asked, "You wanna be alone?" Reyes replied, "No, it's just, just don't ask any questions," and then said, "Can we just call the detectives?"

Brandt and Medici then came into the room and took over from Heard. At no point in the interview that followed did they provide *Miranda* warnings.

Brandt asked at the outset, "[W]hat's your biggest concern, going to jail?"

> Reyes: Think so.
>
> Brandt: At all or for a long time?
>
> Reyes: For a long time.
>
> Brandt: Okay, how long do you think you would go to jail for?
>
> Reyes: I don't know. Like it's a murder, probably like 25 years.
>
> Brandt: Yeah? How old are you?
>
> Reyes: 15.
>
> Brandt: How many 15 year olds do you know that go to jail for 25 years?
>
> Reyes: None.
>
> Brandt: Huh?

Reyes: None.

Brandt: Okay, so why would you be any different?

Reyes: I don't know.

Brandt then asked, "Remember yesterday I asked you . . . if Derek had anything in his hands or reached for his pockets, anything like that? You remember me asking you that?" Reyes replied, "No." Brandt then told Reyes that Ochoa had had a gun:

> There's a reason, a very easy explanation to this whole thing. . . . The deal is . . . Derek had a gun in his pocket. . . . Now, if he's going for a gun in his pocket or you believed he was going for a gun in his pocket and we find one, that's obviously, and it's, there's an explanation as to what happened. Maybe you just stopped and talked to him because you knew him, and then he's going for a gun or something like that . . . and shit happens.

(Third elision in original.) (Brandt's statement was false. Ochoa had not had a gun.)

Brandt went on, "If it's just . . . a cold blooded thing, no, we just, went up and . . . did it and, and shot him just because, um, and I don't feel bad about it . . . that looks bad." Reyes said, "It wasn't like that." Brandt said, "Tell me, tell me why, how did it happen then?" Reyes hesitated. "I'm scared, man. . . . Make everybody go to prison and everything, like I want everybody to get locked up." Brandt responded, "[I]f

he's going for a gun, dude, . . . that's gotta be explained. We have to know that and we have to be able to tell the District Attorney's office that . . . ." Reyes still hesitated. After encouragement from Brandt, he finally said, "Um hmm, hmm, well, he, you, he always had a gun."

After more encouragement, Reyes said, "He was just running up to the car." Brandt asked, "Okay, was he reaching for his pockets or anything like that?" Reyes replied, "Yeah." Brandt said, "Okay, and what happened?" Reyes replied, "I don't know." Reyes expressed concern about his older cousin, Andres Munoz, and sought to exculpate him. "Well, if I say something like what's going to happen with my cousin? Is he still gonna go to jail? . . . He had nothing to do with it."

Brandt asked, "Did you shoot him because you thought he was going for a gun? Yeah? Did you . . . see the gun in his pocket?"

> Reyes: He was reaching for it.
>
> Brandt: Okay . . . and then what happened?
>
> Reyes: He had a grip on it.
>
> Brandt: Okay, do you remember . . . what pocket it was in, what side it was in? Okay, do you remember seeing the grip of the gun though? And he was reaching for it? But what was he yelling at you guys?

Reyes: I don't know.  It was just, I wasn't panicked . . . ain't gonna say nothing, just scared.

Brandt: You were scared cause he was going for the gun?  And then, and what happened?

Reyes: I don't know.  I just shot.

Reyes's statement that he had shot Ochoa came early in the interview, on the seventh page of the transcript.  Brandt and Medici continued to question and talk to Reyes for another thirty-five pages.  Much of the later exchange was friendly, even including a discussion of Christmas.  Reyes said that his family opens presents at "twelve in the night." Brandt responded, "Oh, see I can't stay up that late," and Reyes laughed.  Near the end of the interview, Medici asked, "Does your Mom know about any of this, your Dad?"  Reyes responded, "It'll be cool like if you guys don't tell my Mom, you know, cause . . . [l]ike it'll break her heart and shit, you know, cause like she's very religious."  Brandt told Reyes, "Oh, we don't need to run over there."

Immediately after the February 10 interview at the San Bernardino sheriff's station, Brandt drove Reyes back to the Riverside police station where he and Wheeler had interviewed him the day before.  The length of the drive is not in the record, but it is apparent from a map of the area that it was no more than fifteen miles.  When they arrived at the Riverside police station, Reyes was put in an interview room.

Brandt and Medici together questioned Reyes.  Brandt began the interview:

OK. Uuh, we talked to people at the D.A.'s office and stuff about the case. Kinda told them that, you know, you came clean and finally told us the truth and why things happened and, you know that you were, you know, obviously scared and all that kind of stuff. Uuh, there's more questions that they want answered, if we can. OK, just to, to clarify stuff. Alright, so I wanna talk to you again, but because you've been sitting in that room and the door was locked and you're not free to leave, I wanna read you your rights, OK? And then ask you some questions. OK? You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you're being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning. Do you understand each of these rights that I've explained to you? Yeah? OK. Can we talk about the stuff we talked about earlier today? Is that a yes?

Reyes, who had not previously spoken, answered, "Yeah."

Under questioning from Brandt, Reyes repeated his confession. At the end of the interview, Reyes said, "Let me call my mom." Medici then handcuffed Reyes before taking him to McDonald's to get something to eat.

The total elapsed time, from when Brandt picked up Reyes at his mother's house on February 10 until the

conclusion of the interview at the Riverside police station on
the same day, was somewhere between five and six hours.
Brandt testified at Reyes's preliminary hearing that he picked
up Reyes at approximately 9:00 am to drive him to the San
Bernardino sheriff's station. He estimated that Reyes then
spent about three hours at that station, including both his
polygraph test with Heard and his post-polygraph interview
with Brandt and Medici. During the suppression hearing, the
state represented that Reyes spent four hours at the San
Bernardino sheriff's station. Brandt then drove Reyes to the
Riverside police station for the second interview with Brandt
and Medici. Brandt estimated that the second interview took
between forty minutes and an hour. There is nothing in the
record to indicate that Reyes had anything to eat until Medici
took him to McDonald's for a late lunch at the conclusion of
the interview at the Riverside police station.

## II.  Prior Judicial Proceedings

Reyes and his cousin Andres Munoz were charged in
California Superior Court with first-degree murder. They
were tried before the same judge with separate juries. Reyes
moved to suppress his confession as having been obtained in
violation of *Miranda*. The judge concluded that Reyes's
February 10 post-polygraph confession at the San Bernardino
sheriff's station was voluntary but that he had been in custody
within the meaning of *Miranda* when he made the statement.
The judge therefore suppressed the unwarned post-polygraph
statement at the sheriff's station due to a *Miranda* violation.
However, the judge refused to suppress Reyes's postwarning
confession at the Riverside police station.

At trial, there was inconsistent evidence about the identity
of the shooter. Except for Reyes's postwarning confession,

the evidence largely pointed to Reyes's cousin, Munoz, who had been the driver of the car, rather than Reyes, who had been a passenger.

A friend of both Ochoa and Reyes testified that Reyes had been in the back seat, on the passenger side, of a silver car on the afternoon of the shooting. An eyewitness to the shooting testified that she saw the driver of a silver Camry get out of the car and shoot Ochoa. She made an in-court identification of the driver as Munoz. Another eyewitness agreed with this account. She testified that the driver got out of the car, walked toward Ochoa, shot Ochoa, and "continue[d] shooting until he couldn't anymore." She testified that the back door on the driver's side was opened, but that no one got out of the back seat. She was unable to identify the shooter, either when shown photographs shortly after the shooting, or in the courtroom.

Another witness testified that he heard gunshots as he was pulling out of his father's driveway. He pulled back into the driveway and got out of the car to look. He testified that he saw someone get out of the back seat on the passenger side and come around to the driver's side. "I don't know if he actually went to check on the kid [who had been shot] or . . . what else happened. . . . [I]t just happened so quick." He estimated that the time between the shots being fired and the person getting out of the back passenger seat "wasn't long"—"[m]aybe a couple of seconds." Yet another witness, a friend of Ochoa's, testified that he was on the front porch of a friend's house when he heard shots. His view was obscured by cacti, so he "started walking toward the front yard." "We were going towards [Ochoa], and that's when we saw the guy shooting at him. But I only saw when he just went inside the car, like turned around inside the car and yelled out 'Delhi.'"

He testified that there were five people in the car and that it was "light brown." He testified that he saw only one person get into the car, and that this person got into the back seat on the driver's side.

The jury returned a verdict finding Reyes guilty of first-degree murder with gang and firearm enhancements. The judge sentenced Reyes to fifty years to life in prison: twenty-five years to life for the murder conviction to be served consecutively with a twenty-five years to life sentence for the firearm enhancement. The court stayed sentencing on the two gang enhancements.

Reyes appealed. Citing *Seibert*, Reyes claimed, *inter alia*, that the trial court had erred in admitting his February 10 confession at the Riverside police station, after he had received *Miranda* warnings. The Court of Appeal agreed with the trial judge's suppression of Reyes's unwarned post-polygraph statement at the San Bernardino sheriff's office. The court wrote that it was "not disputed" that Reyes was in custody at the time he made the statement, and that this statement was thus obtained in violation of *Miranda*. The Court of Appeal nonetheless affirmed Reyes's conviction, holding that his subsequent, warned confession at the Riverside police station was admissible.

In the view of the Court of Appeal, the "operative question" was whether Reyes's post-polygraph unwarned and custodial statement had been voluntary. The Court of Appeal wrote:

> The issue on appeal is whether the trial court erred in allowing defendant's subsequent statements made at the Riverside

police station after defendant was advised of his *Miranda* rights. The *operative question* is thus whether defendant was subjected to coercion within the meaning of the Fifth and Fourteenth Amendments when he was interrogated at the sheriff's station and, if so, whether his statements made thereafter at the Riverside police station were the tainted product of the earlier statements.

. . .

We thus will consider whether the trial court erred in finding that defendant's statements were voluntary.

(Emphasis added.)

The Court of Appeal then spent nine pages analyzing in detail what had taken place during the post-polygraph unwarned custodial interview at the police station, concluding that the "trial court had properly ruled defendant's statements, both at the sheriff's station and thereafter at the Riverside police station, were voluntary beyond a reasonable doubt." In the view of the Court of Appeal, because Reyes's unwarned statements while in custody at the sheriff's station had been voluntary, his later postwarning statements at the police station were necessarily "likewise volitional." The Court of Appeal dismissed Reyes's argument under *Seibert* in a single paragraph, on the ground that his statement at the Riverside police station had been "volitional":

Since defendant's statements made at the sheriff's station were voluntary, his waiver of

*Miranda* rights at the Riverside police station
and statements made thereafter were likewise
volitional. Unlike in *Missouri v. Seibert*[,
542 U.S. 600, 617 (2004)], the circumstances
in the instant case need not "be seen as
challenging the comprehensibility and
efficacy of the *Miranda* warnings to the point
that a reasonable person in the suspect's shoes
would not have understood them to convey a
message that [he] retained a choice about
continuing to talk."

(Second alteration in original.)

Reyes filed a state habeas petition contemporaneously
with his direct appeal. The Court of Appeal declined to
consolidate the petition and the appeal, summarily denying
the petition in a one-sentence order. The California Supreme
Court summarily denied both Reyes's direct appeal and his
habeas petition.

Reyes timely filed a petition for federal habeas corpus
under 28 U.S.C. § 2254. In his Report and Recommendation,
the magistrate judge devoted most of his analysis to whether
Reyes's postwarning Riverside police station confession was
coerced. He concluded under the deferential standard of the
Anti-Terrorism and Effective Death Penalty Act ("AEDPA")
that the Court of Appeal had not been unreasonable in
concluding that the confession was not coerced. He
dismissed Reyes's *Seibert* argument in a footnote, concluding
that there was no evidence that the law enforcement officers
deliberately employed the two-step method of interrogation
condemned in that case. The district court adopted without

comment or correction the conclusions and recommendations of the magistrate judge.

Reyes timely appealed. Prior to oral argument, we asked the parties to provide supplemental briefs on *Seibert* and its application to the facts of this case.

### III. Standard of Review

We review de novo the district court's decision to deny Reyes's habeas petition. *Martinez-Villareal v. Lewis*, 80 F.3d 1301, 1305 (9th Cir. 1996).

Under AEDPA, we may not grant an application for a writ of habeas corpus for a state prisoner with respect to any claim adjudicated on the merits in state court unless the state adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). "[C]learly established Federal law" includes only governing legal principles established by the United States Supreme Court at the time the state decision was rendered. *Greene v. Fisher*, 132 S. Ct. 38, 44 (2011).

A state court's decision is "contrary to" clearly established federal law if it applies a rule that contradicts governing Supreme Court precedent or it decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405–07, 413 (2000). A state court decision is an "unreasonable application" of clearly established federal law

"if the state court identifies the correct governing legal rule
. . . but unreasonably applies it to the facts of the particular
state prisoner's case." *White v. Woodall*, 134 S. Ct. 1697,
1705 (2014) (quoting *Williams*, 529 U.S. at 407–08).

"A state-court decision will certainly be contrary to . . .
clearly established precedent if the state court applies a rule
that contradicts the governing law set forth in [Supreme
Court] cases." *Williams*, 529 U.S. at 405; *see also Early v.
Packer*, 537 U.S. 3, 8 (2002) (per curiam) ("Avoiding [a
'contrary to' error] does not require citation of [Supreme
Court] cases—indeed, it does not even require *awareness* of
[Supreme Court] cases, so long as neither the reasoning nor
the result of the state-court decision contradicts them.");
*Frantz v. Hazey*, 533 F.3d 724, 734 (9th Cir. 2008) (en banc)
("[M]istakes in reasoning or in predicate decisions of the type
in question here—use of the wrong legal rule or
framework—do constitute error under the 'contrary to' prong
of § 2254(d)(1)."). If a state court's decision is "contrary to
clearly established Federal law, as determined by the
Supreme Court," § 2254(d)(1), a federal habeas court does
not owe deference under AEDPA to that decision. *Frantz*,
533 F.3d at 739; *cf. Panetti v. Quarterman*, 551 U.S. 930, 948
(2007) (stating this rule for "unreasonable application" error).
If a "contrary to" error is identified, then "we must decide the
habeas petition by considering *de novo* the constitutional
issues raised." *Frantz*, 533 F.3d at 735.

We may also grant a writ of habeas corpus in cases where
the state-court decision "was based on an unreasonable
determination of the facts in light of the evidence presented
in the State court proceeding." 28 U.S.C. § 2254(d)(2). We
"may not second-guess a state court's fact-finding process
unless, after review of the state-court record, [we]

determine[] that the state court was not merely wrong, but actually unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). To grant relief under this prong, "we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Id.* at 1000.

The relevant state court decision for purposes of AEDPA review is the last reasoned state court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 804–06 (1991); *Medley v. Runnels*, 506 F.3d 857, 862 (9th Cir. 2007) (en banc). Here, that decision is the California Court of Appeal's decision on direct review of Reyes's conviction. *See Nunnemaker*, 501 U.S. at 805–06.

## IV. Discussion

Reyes makes two arguments. First, he argues that his postwarning Riverside police station confession on February 10 was coerced in violation of the Fifth Amendment. Second, he argues that this confession was admitted in violation of *Seibert*. For the reasons that follow, we agree with Reyes's second argument. We therefore do not need to reach his first argument.

## A. "Contrary To"

As the Supreme Court explained in *Oregon v. Elstad*, 470 U.S. 298, 304 (1985), "[p]rior to *Miranda*, the admissibility of an accused's in-custody statements was judged solely by whether they were 'voluntary' within the meaning of the Due Process Clause." That is, the pre-*Miranda* exclusionary rule analysis was simply a Due Process Clause voluntariness inquiry. *Miranda* fundamentally altered

the analysis: "The *Miranda* Court . . . presumed that interrogation in certain custodial circumstances is inherently coercive and held that statements made under those circumstances are inadmissible unless the suspect is specifically informed of his *Miranda* rights and freely decides to forgo those rights." *New York v. Quarles*, 467 U.S. 649, 654 (1984) (footnote omitted).  The Court was concerned in *Miranda* that its "'traditional totality-of-the-circumstances' test posed an 'unacceptably great' risk that involuntary custodial confessions would escape detection." *Seibert*, 542 U.S. at 608 (quoting *Dickerson v. United States*, 530 U.S. 428, 444 (2000)).  The Court therefore held in *Miranda* that finding a statement had been "voluntary" would no longer be sufficient.    The Court explained, "Failure to administer *Miranda* warnings creates a presumption of compulsion. Consequently, unwarned statements *that are otherwise voluntary* within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda.*" *Elstad*, 470 U.S. at 307 (emphasis added).  *Miranda* and later cases thus clearly establish that the voluntariness of an unwarned statement during a custodial interrogation is not sufficient to establish the statement's admissibility.

*Miranda* was decided in 1966.  By the time the Court decided *Seibert* in 2004, "*Miranda* warnings" had taken on near-talismanic significance, almost guaranteeing admissibility of a warned statement.  Justice Souter wrote in *Seibert* that "giving the warnings and getting a waiver has generally produced a virtual ticket of admissibility; maintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina, and litigation over voluntariness tends to end with the finding of a valid waiver." *Seibert*, 542 U.S. at 608–09 (Souter, J., plurality opinion).  In *Elstad*, the Court

had held that an unwarned voluntary custodial confession followed by a voluntary warned confession did not require the exclusion of the second, warned confession. But in *Seibert*, the Court limited its holding in *Elstad*. The Court in *Seibert* recognized that "[t]he technique of interrogating in successive, unwarned and warned phases," was a "new challenge to *Miranda*" that *Elstad* had not resolved. *Id.* at 609 (Souter, J., plurality opinion); *see also id.* at 618 (Kennedy, J., concurring in the judgment).

In *Seibert*, a police officer in Rolla, Missouri, conducted an unwarned custodial interrogation of Seibert that was "systematic, exhaustive, and managed with psychological skill." *Id.* at 616. The unwarned custodial interrogation produced a confession. The officer then gave Seibert a twenty-minute coffee and cigarette break. After the break, he read Seibert her *Miranda* warnings, and she signed a written waiver. The officer then resumed questioning, reminding Seibert of her prior prewarning statements. *Id.* at 605. The officer later "testified that he made a 'conscious decision' to withhold *Miranda* warnings, thus resorting to an interrogation technique he had been taught: question first, then give the warnings, and then repeat the question 'until I get the answer that she's already provided once.'" *Id.* at 605–06. The *Seibert* plurality wrote, with some understatement, that the use of this two-step interrogation technique "[wa]s not confined to Rolla, Missouri." *Id.* at 609. Indeed, as the plurality noted, its use had been promoted and endorsed by national police training organizations including the Police Law Institute. *Id.* at 609–10.

Justice Souter observed in his plurality opinion in *Seibert* that the purpose of the two-step interrogation technique was "to render *Miranda* warnings ineffective by waiting for a

particularly opportune time to give them, after the suspect has
already confessed." *Id.* at 611.  He concluded:

> It would have been reasonable to regard the
> two sessions as parts of a continuum, in which
> it would have been unnatural to refuse to
> repeat at the second stage what had been said
> before.  These circumstances must be seen as
> challenging the comprehensibility and
> efficacy of the *Miranda* warnings to the point
> that a reasonable person in the suspect's shoes
> would not have understood them to convey a
> message that she retained a choice about
> continuing to talk.

*Id.* at 616–17.  In a footnote appended to this passage, Justice
Souter made clear that if a two-step interrogation technique
violated *Miranda*, the voluntariness of the postwarning
statement is irrelevant.  In that circumstance, even a voluntary
postwarning statement must be suppressed.  Justice Souter
wrote, "Because we find that the warnings were inadequate,
there is no need to assess the actual voluntariness of the
statement." *Id.* at 617 n.8.

Concurring, Justice Kennedy agreed with Justice Souter
that, if deliberately employed, a two-part interrogation
technique presented "different considerations" from earlier
*Miranda* cases.  *Id.* at 620 (Kennedy, J., concurring in the
judgment). While Justice Kennedy's fifth-vote concurrence
narrowed *Seibert*'s holding to "those cases involving
*deliberate* use of the two-step procedure to weaken
*Miranda*'s protections," *United States v. Williams*, 435 F.3d
1148, 1157–58 (9th Cir. 2006) (emphasis added), the plurality
and Justice Kennedy agreed that even a voluntary

postwarning confession must be excluded where law
enforcement officials deliberately withheld *Miranda*
warnings until after obtaining an in-custody confession, and
where insufficient curative measures had been taken to ensure
that the suspect understood the meaning and importance of
the previously withheld warnings.

Justice Kennedy wrote:

> The plurality concludes that whenever a
> two-stage interview occurs, admissibility of
> the postwarning statement should depend on
> "whether [the] *Miranda* warnings delivered
> midstream could have been effective enough
> to accomplish their object" given the specific
> facts of the case.  . . .   I would apply a
> narrower test applicable only in the infrequent
> case, such as we have here, in which the two-
> step interrogation technique was used in a
> calculated way to undermine the *Miranda*
> warning.

> The admissibility of postwarning
> statements should continue to be governed by
> the principles of *Elstad* unless the deliberate
> two-step strategy was employed.   If the
> deliberate two-step strategy has been used,
> postwarning statements that are related to the
> substance of prewarning statements must be
> excluded unless curative measures are taken
> before the postwarning statement is made.
> Curative measures should be designed to
> ensure that a reasonable person in the
> suspect's situation would understand the

import and effect of the *Miranda* warning and of the *Miranda* waiver. For example, a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn. Alternatively, an additional warning that explains the likely inadmissibility of the prewarning custodial statement may be sufficient.

*Id.* at 621–22 (Kennedy, J., concurring in the judgment) (internal citations omitted).

We take as "clearly established" for purposes of § 2254 the "narrowest" opinion in a fractured majority. *See Marks v. United States*, 430 U.S. 188, 193 (1977); *see also Panetti*, 551 U.S. at 949. In *United States v. Davis*, — F.3d —, 2016 WL 3245043, at *5 (9th Cir. June 13, 2016) (en banc), we interpreted *Marks* as requiring us to analyze "whether the reasoning of a narrower opinion fit[s] entirely into the circle drawn by a broader opinion." Stated differently, a fractured Supreme Court opinion binds us "only . . . when a majority of the Justices agree upon a single underlying rationale and one opinion can reasonably be described as a logical subset of the other." *Id.*

Previously, in *Williams*, we applied *Marks* to hold that the rule established in *Seibert* is to be found by looking at Justice Souter's plurality opinion for four justices, together with Justice Kennedy's narrower concurring opinion. 435 F.3d at 1157. In *Davis*, we cited with approval our earlier opinion in

*Williams*.  *Davis*, 2016 WL 3245043, at \*5.  Justice Souter's plurality opinion requires suppression only where officers employ a two-step technique that renders the *Miranda* warnings ineffective.  His opinion does not require a deliberate intent to employ the forbidden two-step technique. Justice Kennedy largely agreed with the plurality, but wrote that he would add one criterion before finding a *Seibert* violation.  Justice Kennedy wrote, "In my view, [the plurality's] test cuts too broadly. . . . I would apply a narrower test[.]"  *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment).  In Justice Kennedy's view, an interrogating officer not only must employ the two-step technique condemned by the plurality; he or she must also do so "deliberately."  Justice Kennedy's concurrence, based on a rationale narrowing the result reached by the plurality in *Seibert*, thus constitutes "clearly established" law for the purpose of AEDPA review.

Under Justice Kennedy's concurrence, a postwarning statement must be suppressed if interrogating officers deliberately use the two-step interrogation technique that was used in *Seibert*, and if effective curative measures are not taken to ensure that the suspect genuinely understood the *Miranda* warnings.  In the words of Justice Kennedy, quoted above, "[c]urative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver."  *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment).

The California Court of Appeal did not understand *Seibert*.  In the view of the Court of Appeal, the "operative question" under *Miranda* was whether Reyes's unwarned post-polygraph custodial statement at the San Bernardino

sheriff's station had been voluntary. According to the Court of Appeal, if that statement had been voluntary, his later Mirandized statement at the San Bernardino police station was necessarily "likewise volitional." The Court of Appeal spent nine pages addressing the voluntariness of Reyes's unwarned post-polygraph custodial statement at the San Bernardino sheriff's station. For the Court of Appeal, the voluntariness of that statement determined the admissibility of the subsequent warned statement at the Riverside police station. The Court of Appeal addressed *Seibert* in a single paragraph.

We quoted that paragraph above, but we reproduce it here, in its entirety, for the convenience of the reader:

> Since defendant's statements made at the sheriff's station were voluntary, his waiver of *Miranda* rights at the Riverside police station and statements made thereafter were likewise volitional. Unlike in *Missouri v. Seibert*[, 542 U.S. 600, 617 (2004)], the circumstances in the instant case need not "be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that [he] retained a choice about continuing to talk."

(Alteration in original.) The first sentence of the paragraph recites the Court of Appeal's conclusion that Reyes's postwarning statement was "volitional." The second sentence states that, unlike in *Seibert*, Reyes "retained a choice about continuing to talk." That is, in the Court of Appeal's view,

because Reyes "retained a choice," his "continuing to talk" was voluntary.

The clearly established rule under *Seibert* is that if officers deliberately employ the two-step technique employed in *Seibert*, and if insufficient curative measures are taken to ensure that later *Miranda* warnings are genuinely understood, any warned statement thereby obtained must be suppressed, even if the statement is voluntary. Contrary to *Seibert*, the Court of Appeal did not address the question whether the officers deliberately employed the two-step technique. Also contrary to *Seibert*, the Court of Appeal did not address the adequacy, or even existence, of any "curative measures." Instead, the Court of Appeal analyzed at length the coerciveness surrounding Reyes's post-polygraph unwarned custodial statement at the San Bernardino sheriff's station and concluded that because his confession was voluntary his subsequent warned statement at the Riverside police station was also voluntary.

Under the circumstances of this case—where police interrogated fifteen-year-old Reyes over the course of two days; where on the first day at the Riverside police station they conducted a two-hour unwarned interrogation; where on the second day at the San Bernardino sheriff's station they obtained a confession during an unwarned interrogation following an unwarned custodial polygraph test; and where they transported Reyes back to the Riverside police station and obtained a postwarning confession "clarifying" what he had stated at the sheriff's station—a *Seibert* analysis was clearly required.

Contrary to *Seibert*, the Court of Appeal did not conduct such an analysis. Instead, the Court of Appeal examined only

whether Reyes's statement in his post-polygraph custodial interrogation was voluntary.  It wrote, as a prelude to its analysis, that the "operative question" was voluntariness: "We thus will consider whether the trial court erred in finding that defendant's statements were voluntary."    Upon determining that Reyes's unwarned statements were voluntary, the Court of Appeal concluded that Reyes's later warned statement at the Riverside police station was necessarily "likewise volitional."  The Court of Appeal then affirmed the trial court's decision not to suppress Reyes's postwarning statement.  The Court of Appeal thus addressed, and treated as dispositive, the question whether Reyes's postwarning statement was voluntary, which is precisely the question that is irrelevant under *Seibert*.

We therefore conclude that the Court of Appeal's decision was "contrary to . . . clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1). Because its decision was "contrary to" *Seibert*, we owe it no deference.

On  habeas  review,  the  federal  magistrate  judge recommended denying relief, rejecting in a footnote Reyes's argument under *Seibert*.   The magistrate judge correctly understood the rule in *Seibert* but concluded without analysis of the evidence that the law enforcement officers in this case had  not  deliberately  employed  the  two-step  interrogation process.  Deliberateness is a factual finding that we review for clear error.  *United States v. Narvaez-Gomez*, 489 F.3d 970, 974 (9th Cir. 2007); *McClure v. Thompson*, 323 F.3d 1233, 1240 (9th Cir. 2003) (applying clear error review to findings of fact made by a district court on AEDPA review). Clear error review requires us to form a "definite and firm conviction that a mistake has been committed."  *Easley v.*

*Cromartie*, 532 U.S. 234, 242 (2001) (internal quotation marks omitted). A more searching review is appropriate where the trial court's decision was based on documents, as it was here, rather than credibility evaluations. *See id.* at 243 ("[T]he key evidence consisted primarily of documents and expert testimony. Credibility determinations played a minor role. Accordingly, we find that an extensive review of the District Court's findings, for clear error, is warranted."); *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 500–01 (1984) ("The same 'clearly erroneous' standard applies to findings based on documentary evidence as to those based entirely on oral testimony, but the presumption has lesser force in the former situation than in the latter." (internal citation omitted)).

We conclude that the magistrate judge, and the district court in entering judgment based on the recommendation of the magistrate judge, clearly erred. We wrote in *Williams* that evidence of deliberateness in a *Seibert* inquiry can be either objective or subjective. "[I]n determining whether the interrogator deliberately withheld the *Miranda* warning, courts should consider whether objective evidence and any available subjective evidence, such as an officer's testimony, support an inference that the two-step interrogation procedure was used to undermine the *Miranda* warning." 435 F.3d at 1158. The absence of direct evidence of subjective intent is not dispositive. *United States v. Capers*, 627 F.3d 470, 479 (2d Cir. 2010). As we have recognized, "the most plausible reason" for delaying *Miranda* warnings until after a suspect has confessed "is an *illegitimate* one, which is the interrogator's desire to weaken the warning's effectiveness," *see Williams*, 435 F.3d at 1159, and "the intent of the officer will rarely be as candidly admitted as it was [in *Seibert*]." *Id.*

at 1158 (quoting *Seibert*, 542 U.S. at 617 n.6 (Souter, J., plurality opinion)).

In *Williams*, we provided a nonexhaustive list of probative objective evidence of deliberateness.  Such evidence includes "the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre- and postwarning statements."  *Id.* at 1159; *see also United States v. Barnes*, 713 F.3d 1200, 1205 (9th Cir. 2013) (per curiam) (examining the record for objective evidence under *Seibert*); *Capers*, 627 F.3d at 479 ("[W]e join our sister circuits in concluding that a court should review the totality of the objective and subjective evidence surrounding the interrogations in order to determine deliberateness, with a recognition that in most instances the inquiry will rely heavily, if not entirely, upon objective evidence."); *United States v. Nunez-Sanchez*, 478 F.3d 663, 668–69 (5th Cir. 2007) (examining the totality of the circumstances to infer deliberateness); *United States v. Street*, 472 F.3d 1298, 1314 (11th Cir. 2006) (holding that the deliberateness determination requires an evaluation of "the totality of the circumstances, including 'the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre- and post-warning statements'" (quoting *Williams*, 435 F.3d at 1159)); *United States v. Briones*, 390 F.3d 610, 614 (8th Cir. 2004).

Based on the objective evidence in this case, we conclude that Brandt and his fellow officers deliberately employed the two-step interrogation technique condemned in *Seibert*, and that the magistrate judge and the district court clearly erred in concluding otherwise.  Reyes first confessed in the unwarned

custodial interrogation conducted by Brandt and Medici at the San Bernardino sheriff's station on February 10, after Heard told Reyes that he had failed the polygraph test. The California Court of Appeal wrote that it is "not disputed" that Reyes was in custody during this interrogation. Because the interrogation was custodial, both the trial judge and California Court of Appeal concluded that this unwarned confession at the San Bernardino sheriff's station was obtained in violation of *Miranda*. This unwarned interrogation, as well as the unwarned interrogation the previous day at the Riverside police station, were, like the interrogation in *Seibert*, "systematic, exhaustive, and managed with psychological skill." *Seibert*, 542 U.S. at 616.

In the unwarned custodial interrogation at the San Bernardino sheriff's station, Brandt and Medici obtained statements from Reyes admitting that he shot Ochoa; providing the outline of the events that occurred that afternoon; providing information about how Reyes obtained the gun used in the shooting and what happened to it afterward; and providing details about the shooting. In the warned interrogation at the Riverside police station that followed, Reyes provided essentially the same information.

The three Riverside police officers involved in the case—Brandt, Wheeler and Medici—were all experienced officers. *Cf. Capers*, 627 F.3d at 481 ("Inexperience, while not a legitimate excuse for postponing a *Miranda* warning, nevertheless may save a confession from exclusion under *Seibert*."). All three were homicide detectives. At the time of the interrogations, Brandt had been a police officer in California for twelve years and a homicide detective for the last four. The tenure of Wheeler and Medici is not specified

in the record, but we may infer from their ranks that they both had substantial experience.

Brandt did not take "curative measures" to ensure that Reyes understood "the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment). Indeed, he did quite the opposite. Brandt was the lead investigator. He was involved in the case from beginning to end. Brandt asked Reyes to accompany him to the Riverside police station on the morning of February 9 after the SWAT team had entered Reyes's aunt's house and placed him in handcuffs. Brandt and Wheeler questioned Reyes at the police station for about two hours that day. During that interview, Brandt asked Reyes if he would be willing to take a polygraph examination. Brandt picked Reyes up at his mother's house the next morning and took him to the San Bernardino sheriff's station for the examination. After Heard told Reyes that he had failed the polygraph examination, Brandt and Medici came into the room and took over from Heard. During the unwarned custodial interview at the San Bernardino sheriff's station on February 10, Brandt and Medici obtained a detailed confession from Reyes. After obtaining the confession, Brandt immediately drove Reyes directly to the Riverside police station, where he and Wheeler had questioned him the day before. On arrival at the Riverside station, Brandt and Medici questioned Reyes again. At the beginning of this interview, Brandt finally provided *Miranda* warnings. During this interview, Reyes gave Brandt and Medici the same detailed confessions he had just given.

Brandt and Medici had obtained the incriminating information from Reyes very early in the unwarned custodial interrogation at the sheriff's station, on the seventh page of

the transcript. Yet they continued questioning and talking to Reyes for another thirty-five pages. They did so in a nonconfrontational, sympathetic way, with the result that Reyes was made to feel sufficiently comfortable that he talked about his family's Christmas rituals and laughed when Brandt said he could not stay up late enough to open presents. At the end of the session, Reyes even asked Brandt and Medici not to tell his mother what he had confessed to them: "It'll be cool like if you guys don't tell my Mom."

At the beginning of the follow-up questioning at the Riverside police station, Brandt gave Reyes the *Miranda* warnings, as recounted above. But, as is evident from the transcript, he played down their importance. He said he wanted "just to clarify stuff," suggesting by his use of the word "clarify" that the "stuff" had already been conveyed in the earlier interview, and that the only purpose of the later interview was clarification. Brandt then said he wanted to "read you your rights" because "you've been sitting in that room and the door was locked and you're not free to leave." An experienced officer in Brandt's position would have known that to a reasonable person not trained in the law, let alone a fifteen-year-old high school freshman, these stated reasons were hardly an effective means of conveying the fact that the warning he was about to give could mean the difference between serving life in prison and going home that night.

After Brandt read the *Miranda* warnings, he said, "Do you understand each of these rights that I've explained to you? Yeah? OK. Can we talk about the stuff we talked about earlier today? Is that a yes?" While giving the *Miranda* warnings, Brandt did not pause to ask "Is that a yes?" after asking if Reyes understood "each of the rights"

listed. Only after the *Miranda* warnings had been completed
and after Brandt asked whether "we [can] talk about the stuff
we talked about earlier today" did Brandt finally ask "Is that
a yes?" and wait for a response. In contrast to the
interrogation in *Seibert*, Brandt did not ask Reyes for a signed
waiver of rights or a signed acknowledgment of having read
and understood the *Miranda* warnings.

The psychological, spatial, and temporal break between
the unwarned and warned interrogations was not enough to
cure the *Miranda* violation. Perhaps most important, Brandt
had been a continuous presence throughout. He and Wheeler
were the two questioners in the unwarned interrogation on
February 9; he was the primary questioner in both the
unwarned and warned interrogations on February 10; and he
had personally driven Reyes on February 9 and 10, including
the short trip between the sheriff's station and the police
station on February 10. Further, although the unwarned
custodial interrogation on February 10 took place at the San
Bernardino sheriff's station and the warned interrogation took
place at the Riverside police station later that day, the warned
interrogation was conducted in a familiar place where Reyes
had been questioned by Brandt the day before. The record
does not tell us the driving distance and time between the
sheriff's station and the Riverside police station, but a map of
the area indicates that it was no more than fifteen miles. The
timeline for the events on February 10, described above,
indicated that the driving time was not likely to have been
more than about thirty minutes. This case is quite unlike
*Bobby v. Dixon*, 132 S. Ct. 26, 32 (2011) (per curiam), in
which there was a four-hour gap, during which the defendant
was transported from the police station to a separate jail and
back, and during which the defendant spoke with his lawyer
and learned material facts about the ongoing investigation.

*See also Capers*, 627 F.3d at 484 (holding that a ninety-minute break in time between interrogations was not curative in part because police personnel were consistent and "both [interrogations] occurred while Capers remained in handcuffs and in settings that clearly established the authoritative nature of the questioning").

### B.  "Unreasonable Determination of the Facts"

Our concurring colleague reads the Court of Appeal's decision as understanding and applying *Seibert*.  In his view, the Court of Appeal's quotation from Justice Souter's plurality opinion (in the paragraph we quoted above) shows that it understood *Seibert*, and that the Court of Appeal viewed the question before it to be whether Brandt and his fellow officers took sufficient curative measures to ensure that the *Miranda* warnings given at the Riverside police station were effective.  But our colleague nonetheless agrees with the result we reach in this case.  In his view, even under AEDPA's deferential standard, we must grant habeas relief because the Court of Appeal's conclusion that sufficient curative measures were taken is an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  *See* Concurrence at 78–80.

For the reasons given above, we disagree with our concurring colleague on the question whether the Court of Appeal's decision was "contrary to" *Seibert*.  However, we note that, although we do not need to reach the question whether the Court of Appeal's decision rests on an "unreasonable determination of the facts," we entirely agree with him on that question.  It is readily apparent, on the factual record of this case, that Brandt and the others were

experienced officers who acted carefully and deliberately in performing their two-step interrogation, and further, that they did not take "curative measures" that would "ensure that a reasonable person in [Reyes's] situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver."   542 U.S. at 622 (Kennedy, J., concurring in the judgment).   Indeed, as described above, far from taking "curative measures," they took affirmative steps to ensure that Reyes did *not* "understand the import and effect" of the *Miranda* warnings he was finally given at the Riverside police station.

## Conclusion

The California Court of Appeal applied a rule that was contrary to federal law as clearly established by the Supreme Court in *Seibert* when it concluded that Reyes's postwarning confession was admissible solely on the ground that his unwarned custodial statement was voluntary, and that his subsequent warned statement therefore was also necessarily voluntary.   We hold that police officers deliberately employed a two-step interrogation technique, and that they did not take appropriate "curative measures," in violation of *Seibert*.   We therefore hold that Reyes's postwarning confession should have been suppressed.   Because the state did not argue harmless error in this court or the district court, that defense is waived. *See United States v. Vallejo*, 237 F.3d 1008, 1026 (9th Cir. 2001).   Accordingly, we reverse the district court's denial of Reyes's petition for a writ of habeas

corpus and remand with instructions to grant the writ unless Reyes is retried within a reasonable time, not to exceed 180 days.

**REVERSED and REMANDED.**

SINGLETON, Senior District Judge, concurring:

The majority has joined in a thoughtful and thorough judgment in this case. I concur in that judgment. The majority has forcefully marshaled the facts and analyzed the applicable law. If this case had arisen entirely within the federal system, *e.g.*, under 28 U.S.C. § 2255, I would fully join in the opinion and have no further comments or suggestions.

This case does not arise entirely within the federal system, however, but comes to us from state court under § 2254, and thus our review must be guided by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). AEDPA requires us to give deference to decisions of the state courts both as to the facts and the law, except in limited circumstances.

The majority identifies *Missouri v. Seibert*, 542 U.S. 600 (2004), as clearly established federal law at the time the California Court of Appeal decided this case and looks to Justice Kennedy's concurring opinion to provide the appropriate rule of decision. I agree. *See United States v. Williams*, 435 F.3d 1148, 1157–59 (9th Cir. 2006) (analyzing *Seibert* and concluding that Justice Kennedy's opinion is the narrowest holding obtaining five votes). In the majority's

view, the California Court of Appeal recognized *Seibert* as controlling but unreasonably interpreted it, effectively ignoring *Seibert* and deciding the case under the prior law set out in *Oregon v. Elstad*, 470 U.S. 298 (1985). The majority concludes that, since the California court failed to apply clearly established law, we may withhold any deference and exercise our independent judgment in reviewing the California Court of Appeal's decision de novo.

I disagree. My review of the record leads me to conclude that the California Court of Appeal's conclusions of law are in conformity with *Seibert* and Justice Kennedy's concurrence. In my view, the state court's approach to the law is sound, but its finding of facts are unreasonable in context. I therefore, on this alternate ground, join in this Court's judgment. My reasons are as follows.

In reaching a contrary view, the majority focuses exclusively on one part of Justice Kennedy's concurrence. *Seibert* addresses what we have termed a two-step interrogation leading to a confession. The first part of the interrogation is unwarned. Once the suspect confesses, *Miranda* warnings are given, and the interrogation resumes. Typically, the suspect confirms his confession. In practice, the earlier confession is suppressed, but following *Elstad*, the subsequent post-warning statement is allowed into evidence if it is voluntary. *Seibert* modified *Elstad* in cases such as this. The opinion was fragmented. Justice Souter wrote an opinion for a plurality of four justices. Justice Kennedy separately concurred, arguably on a more limited basis, and Justice O'Connor wrote a dissent in which three other justices joined. The majority and I agree that Justice Kennedy's opinion provides the holding of *Seibert.* We disagree on how *Seibert* should be applied to this case.

In my view, Justice Kennedy adopts all of Justice Souter's plurality opinion but imposes a limitation. Rightly understood, Justice Kennedy's opinion adopts a two-part test for determining the validity of a confession where the police use a two-step approach in their interrogation of a suspect. The first prong, which I will call the Kennedy prong, asks whether the two-step procedure was chosen intentionally in order to render subsequent *Miranda* warnings ineffective. The second prong, which I will call the Souter prong, asks if the two-step process, whether or not intentional, rendered the subsequent warnings ineffective. For Justice Kennedy, both prongs must be satisfied in order to create a *Siebert* violation and take the case out of *Oregon v. Elstad.* Since the test has two prongs, it is analogous to the *Strickland* test for determining ineffective assistance of counsel.[1] Like that test, a reviewing court should be able to look to either prong first, and, if that prong is not satisfied, there is no need to address the other prong. *See Pearson v. Callahan*, 555 U.S. 223, 241 (2009). Viewed in this light, the California Court of Appeal's decision is within the law. That court quoted Justice Souter directly for the second prong of the test and concluded that nothing in the record of the interrogation "challenged the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that [he] retained a choice about continuing to talk."

Justice Kennedy's test requires that any two-step procedure must be intentionally motivated to undermine *Miranda*. Justice Souter rejects reference to the police intent and focuses only on whether the process itself challenged the comprehensibility and effectiveness of the *Miranda* warnings.

---

[1] *Strickland v. Washington*, 466 U.S. 668 (1984).

Thus, if as the California Court of Appeal found, Reyes understood at the time of the second stage of the interview that he retained a choice about whether to talk, his decision to talk was consistent with *Seibert*, and there was no need for the Court of Appeal to address the first prong of the test and determine whether the police intended to nullify the *Miranda* warnings.

The Court of Appeal did not separately address the first prong of the test, and so by analogy to *Strickland*, we may review that prong de novo and exercise independent judgment.[2] *See Porter v. McCollum*, 558 U.S. 30, 39 (2009); *Mann v. Ryan*, 774 F.3d 1203, 1215 (9th Cir. 2014) ("Because the state post-conviction court did not reach the deficiency prong of the *Strickland* analysis, our review of this prong is not circumscribed by AEDPA."). I agree with the majority that, under the facts of this case, the use of the two-step procedure was a conscious effort to undermine *Miranda. See Williams*, 435 F.3d at 1158–60 (discussing how a court should determine whether an interrogation was deliberately used to undermine *Miranda*).

The second prong of the test was addressed by the Court of Appeal, and we must grant deference and may only reject the finding if it was "based on an unreasonable determination

---

[2] It is clear that the Court of Appeal did not think that the procedure followed undermined the effectiveness of the mid-stream *Miranda* warnings. It is not clear that the Court of Appeal considered whether the procedure was chosen to undermine *Miranda*. Even if I were to assume that the Court of Appeal found no intent, sub silentio, requiring deference I would still conclude under *Williams* that the procedure was chosen intentionally. *See Williams*, 435 F.3d at 1160 (discussing how to prove a deliberate choice of procedure).

of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254 (d)(2).

The majority points out that the Court of Appeal did not explain its factual finding that the mid-stream *Miranda* warning was not undermined by the interrogation procedure chosen by the police.  In such a case, we must look to all of the relevant evidence to determine if the fact finding is reasonably supported.  *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) ("Federal habeas review is not *de novo* when the state court does not supply reasoning for its decision, but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law.").  Reyes has a heavy burden to establish that a state court fact finding is unreasonable.  *See Burt v. Titlow*, __ U.S. __, 134 S. Ct. 10, 15–16 (2013).  I am satisfied that he has sustained that burden here.

The majority has summarized all of the relevant evidence, and it need not be repeated here.  Guided by *Williams* regarding a determination of the effectiveness of mid-stream *Miranda* warnings, *see Williams*, 435 F.3d at 1160–62, I do not believe that there is substantial evidence that would support an inference that the warnings given to Reyes were effective at the time they were given.  There is no evidence of the corrective measures identified by Justice Kennedy. Turning to the factors considered relevant by the plurality: 1) the pre-warning interrogation was complete and detailed, consuming many hours; 2) the two rounds of interrogation overlapped; 3) the two rounds of interrogation were close in time; 4) there was a continuity of police personnel; and, most importantly, 5) the interrogator's questions treated the second round of interrogation as continuous with the first.

Viewed in light of the totality of the circumstances, there is no evidence that would permit a finding that the two-step interrogation in this case did not undermine *Miranda* and lead to an involuntary confession.